DR. SEUSS ENTERPRISES, L.P., a
California limited partnership,
Plaintiff,

v.

PENGUIN BOOKS USA, INC., a corporation; Dove, Inc., a corporation; Dove II, Inc., a corporation, Michael Viner, an individual; Alan Katz, an individual; and Chris Wrinn, an individual, Defendants.

No. 96–0302 J (RBB).

United States District Court,
S.D. California.

April 29, 1996.

Gray, Cary, Ware and Freidenrich, San Diego, CA, for Dr. Seuss Enterprises, L.P.

Vincent Cox, Gary M. Grossenbacher, Leopold, Petrich and Smith, Los Angeles, CA, for Penguin Books USA, Inc., Dove Audio Inc.

## ORDER MODIFYING PRELIMINARY INJUNCTION

JONES, District Judge.

## I. INTRODUCTION

Defendant Alan Katz conceived and wrote *The Cat Not in the Hat! A Parody by Dr. Juice,* a work poised to supply a "fresh new look" at the O.J. Simpson double-murder trial. Katz's rhymes, the illustrations provided by Chris Wrinn, and the book's packaging by the manufacturer defendants [1] (the individual and corporate defendants are referred to collectively hereinafter as "Penguin") mimic the distinctive style of the family of works created by Theodor S. Geisel, better known as Dr. Seuss.[2]

Dr. Seuss's works are designed to hold a child's interest through playful rhymes and illustrations which describe and depict extremely fanciful creatures and situations. Penguin's book appears to wander through Dr. Seuss's works, picking up an illustration here, a rhyme there, to create a "wickedly clever" "Dr. Juice" "who tells the whole story [of the O.J. Simpson double-murder trial] in rhyming verse and sketches as witty as Theodore [sic] Geisel's best." *See* Exhibit 8.

Dr. Seuss's complaint alleges that Penguin's work takes substantial protected elements of Dr. Seuss's copyrighted works; that it uses six unregistered and one registered Dr. Seuss trademarks; and that it dilutes the

---

1. Penguin Books USA, Inc., Dove, Inc., Dove II, Inc., and Michael Viner.

2. Plaintiff Dr. Seuss Enterprises, L.P., owns the copyright and trademark rights to the family of works created by Mr. Geisel.

distinctive quality of these famous marks. Accordingly, Dr. Seuss brings suit under the enforcement provisions of copyright code, 17 U.S.C. §§ 501–02; the Lanham Act, 15 U.S.C. § 1125(a); and the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1). Penguin does not contest Dr. Seuss's allegations that it relied upon Dr. Seuss's books in creating its own, but rather argues that its use was non-infringing.

The Court's Order Granting Preliminary Injunction found a strong likelihood that Penguin had taken substantial protected expression from the copyrighted works *The Cat in the Hat, Horton Hatches the Egg,* and *One fish two fish red fish blue fish,* and that Dr. Seuss would prevail at trial against Penguin's fair use defense. The Court found that the trademark claim raised serious questions presenting a fair ground for litigation, and that the balance of hardships favored Dr. Seuss. The Court did not find a reasonable likelihood of success on the dilution claim.

On the basis of newly discovered evidence and arguments reasonably omitted at the preliminary injunction hearing, Penguin requested reconsideration of the findings of fact and conclusions of law in that Order. Dr. Seuss requested that the activities enjoined be broadened to reflect the Court's findings of fact. Finding merit in both requests, the Court substitutes this Order and modifies its findings of fact and conclusions of law as indicated herein.

The Court still finds a strong likelihood of success on the claim that Penguin took substantial protected expression from *The Cat in the Hat,* and that it will prevail at trial against a fair use defense. The Court does not find a strong likelihood of success on the copyright claims based on the works *One fish two fish red fish blue fish* and *Horton Hatches the Egg.* The trademark and dilution findings remain unchanged. The finding of a strong likelihood of success on the copyright claim raises a presumption of irreparable harm. This alone entitles Dr. Seuss to an injunction. The finding that the trademark claims present serious questions for litigation, coupled with the finding that the balance of hardships tips markedly in Dr. Seuss's favor presents an independent ground for granting an injunction. Accordingly, the injunction shall continue as modified until the conclusion of the trial on the merits.

## II. STANDARD GOVERNING PRELIMINARY INJUNCTIONS

Courts within the Ninth Circuit may issue a preliminary injunction if the following standard is met.

To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.

*Big Country Foods, Inc. v. Board of Education,* 868 F.2d 1085, 1088 (9th Cir.1989) (internal citations omitted). The plaintiff's burden of showing a likelihood of success on the merits includes the burden of showing a likelihood that it would prevail against any affirmative defenses raised by the defendant. *Atari Games Corp. v. Nintendo of America Inc.,* 975 F.2d 832, 837 (Fed.Cir.1992) (citing *Gutierrez v. Municipal Court of the Southeast Judicial District, County of Los Angeles,* 838 F.2d 1031, 1038–45 (9th Cir.1988) (Title VII claim)).

The exigencies of preliminary relief often prevent the movant from procuring supporting evidence in a form that would meet Rule 56(e)'s requirement of evidence admissible at trial. Such evidence may yet be considered by the court, which has discretion to weight the evidence as required to reflect its reliability. *See* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2949 at 215–18 (1995) [hereinafter Wright].

Whether it grants or denies the application for a preliminary injunction, Rule 52(a) re-

quires that the court "set forth the findings of fact and conclusions of law which constitute the grounds for its action." Fed. R.Civ.P. 52(a) ("[I]n granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action."). If the Court decides to grant the application, the order should provide sufficient detail that a reasonable person would be able to read the order alone to determine exactly what is proscribed and why. Fed. R.Civ.P. 65(d) ("Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in its terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."); 11A Wright, at § 2955, at 308–09.

## III. PROBABILITY OF SUCCESS ON THE MERITS

### A. Copyright Claim

■ To prove copyright infringement, the plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). As the Supreme Court's phrasing of the standard implies, the copyright laws do not forbid all copying, but only that copying that appropriates protected elements of a copyrighted work. *Sid & Marty Krofft Tel. Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1165 (9th Cir.1977) ("To constitute an infringement, the copying must reach the point of unlawful appropriation, or the copying of the protected expression itself.") (internal quotation marks omitted). A finding of infringement therefore consists of three sub-parts: (1) that the defendant's work shares protected elements of the plaintiff's work; (2) that the commonalities arise not from independent creation but from copying; and (3) that the plaintiff owns a valid copyright in the work.[3]

### 1. Commonalities in Protected Expression

#### a. Similarities in Text

■ The Dr. Seuss work *One fish two fish red fish blue fish* begins in exactly that manner: "One fish/two fish/red fish/blue fish." In the Defendant's work we find the passage "One knife?/Two knife?/Red knife/Dead wife." The recurring theme of *Horton Hatches the Egg* is "And I said what I meant .../An elephant's faithful/One hundred per cent!" Defendant's work contains the passage "He said what he meant/A houseguest is faithful/One hundred percent."

The Dr. Seuss passages that bear such a striking similarity to those of "Dr. Juice" certainly contain sufficient originality to qualify as protected expression. In the first

---

**3.** Penguin argued initially that the Court should limit its analysis to the works named in the complaint, for its answer and opposition were framed in response to these works and not the entire library of Dr. Seuss works.

However, until the Magistrate Judge permitted expedited discovery, the plaintiff had only the book-trade advertisement to refer to in determining whether and which of its works were infringed by the defendant's work. *See* Exhibit 8. The Federal Rules require the plaintiff to provide only a *"fair* notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (emphasis added). Fairness depends upon the circumstances. Under these circumstances, where the plaintiff acted to prevent initial distribution; where the complaint identified the family of works that the defendants may have infringed; and where the defendants prevented earlier access to the infringing work, it would be unduly technical to restrict equity to the infringed works specifically identified in the

complaint. The allegation that the book infringed *The Cat in the Hat* should have been sufficient to notify the defendant that it should be prepared to defend against the entire library of works reasonably related to *The Cat in the Hat.* Especially given that Dr. Seuss's initial moving papers alerted Penguin that other works might be raised when the infringing work was received for analysis, and that Dr. Seuss's Reply provided Penguin specific allegations of infringement of these other works by written brief a day and a half before the preliminary injunction hearing, the Court rejected Penguin's refusal to acknowledge the additional works as at issue.

Thus even though only the infringements of *The Cat in the Hat* actually entitle the plaintiff to a preliminary injunction, the Court has considered ownership, copying, and infringement of each of the works described in the complaint and moving papers. Defendant's arguments and evidence in relation to the additional works are considered and reflected in this amended Order.

passage, Dr. Seuss creates a pleasing rhythm and whimsical effect through the use of two perfectly rhyming, monometric couplets, unified by epistrophe. His use of these literary devices represents several significant expressive choices protected by copyright, and appropriated in their entirety in the infringing work. *Cf. Feist,* 499 U.S. at 357–59, 111 S.Ct. at 1294 (copyright protects those elements of the work that owe their origin to the author, including, in the case of factual works, original decisions as to the selection, coordination, and arrangement of facts). The dissimilarities between the works—the punctuation and capitalization; the absence of Dr. Seuss's use of assonance between the first word of the second and fourth lines; the loss of the epistrophe in the fourth—probably owe more to the storytelling requirements of the satire than any creative decisions by Defendant Katz. Again, in the second passage, Dr. Seuss's choices as to stanza type (tercet), rhyme (masculine perfect), assonance, and accent are all protectable and all appropriated.

### b. Similarities in Illustrations

Exhibit 1 compares a drawing of the character the Cat in the Hat with the cover art of Defendant's book. The hat in both works is a stove-pipe hat with five thick alternately dark and light stripes. The eyes are closed, inverted semi-circles; eyelashes are depicted in each with a few simple downward strokes. The ears are rounded with a single cavity. The feet slope unnaturally long and flat.

Exhibit 2 compares the famous cover of *The Cat in the Hat* with the back cover of *The Cat Not in the Hat.* The stove-pipe hat is again a commonality. The characters stand identically composed with long necks, narrow shoulders, and interlinked hands placed above a slightly paunchy belly. Both bear a vaguely mischievous expression formed by upraised eyebrows and a closed-lip smile, the smile created with a single upturned line and two small circles at either edge. The eyes are ovals, pupils depicted by small horseshoe-like semicircles within.

Exhibit 3 compares two illustrations from *Horton Hatches the Egg* with a page 31 of Penguin's work. Defendant's "Kato" shares Horton's smile, eyes, and upraised eyebrows.

The bird depicted in Defendant's work shares Maysie Bird's tail of two ribbons; her upturned beak, closed eyes and silly smile; her downturned wings; the fold of her legs; the straight-line sketches at rear; and her flight pattern.

Exhibit 4 compares an illustration of *Green Eggs and Ham* with page 8 of Penguin's book. The only commonality the Court notices is the existence of a platter in both illustrations.

Exhibit 5 compares an illustration from *How the Grinch Stole Christmas* with an illustration from page 40 of Penguin's book. Both illustrations depict a chorus. However, Penguin's illustration, while it evokes the chorus in the Dr. Seuss original, does not seem to actually lift from the original.

Exhibit 6 compares another illustration from *How the Grinch Stole Christmas* with pages 27–28 of Penguin's book. In the original the Grinch trumpets through a large horn, while in Penguin's version a dog barks through an even larger horn. The Grinch and the dog bear no similarity. The horn is also rather differently depicted. Amplification depicted by straight lines emanating from a horn is a stock device. The Court finds no similarities of protectable expression in these works.

Exhibit 7 compares an illustration from *The Sneetches* with pages 19–20 of Penguin's book. Both depict the idea of entering and exiting a large machine. However, the machine is different, the creatures are different, and the setting is different. The idea of a whacky transformative machine may not be protected. The Court finds no improper appropriation evidenced in these works.

In sum, while the illustrations in Exhibits 4–7 do not show significant similarities, Exhibits 1–3 do evidence significant similarities.

### 2. Evidence that the Commonalities Arose through Copying

Copying is a question of fact that calls for any evidence that would the trier of fact to conclude that discovered similarities in protected expression arose not from independent creation but from copying. Copying generally must be inferred from circumstan-

tial evidence. Such evidence might consist of a showing of defendant's actual or likely access to the copyrighted work plus similarities between the copyrighted work and the defendant's work; or a strong showing of similarities alone, without proof of access; or even telling *dissimilarities* that betray the plagiarist's attempt to hide his tracks. *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946) ("Of course, if there are no similarities, no amount of evidence of access will suffice to prove copying. If there is evidence of access and similarities exist, then the trier of facts must determine whether the similarities are sufficient to prove copying.... If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result."); *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir.1969) ("[W]e feel that the very nature of these differences only tends to emphasize the extent to which the defendant has deliberately copied the plaintiff.").

Defendant Katz has admitted that "[t]he style of the illustrations and lettering used in [*The Cat Not in the Hat!*] were inspired by [*The Cat in the Hat*]," Decl. of Alan Katz in Opp. to Mot. for Prelim. Inj., ¶ 9, and that in writing certain couplets, he "drew from" *One fish two fish red fish blue fish*. Decl. of Alan Katz in Supp. of Mot. for Reconsideration, ¶ 5. These admissions alone are probably sufficient to permit a jury finding that protected elements of Dr. Seuss's text and illustrations found in Penguin's book got there through copying and not coincidence.[4]

In addition, the declarations attached to Dr. Seuss's papers state what is common knowledge, that Dr. Seuss books fill libraries and bookstores worldwide. Thus it is quite likely that both Katz as writer and Wrinn as illustrator had access to Dr. Seuss's works.

Similarities are also rather clear. This is an intentional parody of the original, quite

deliberately appropriating the most distinctive elements. Penguin's book mimics the illustration and rhyming style of Dr. Seuss. Although these elements are not copyrightable, they are relevant to whether copying took place. Beyond these general similarities, the similarities of protected expression detailed in subsections 1(a) and (b), above, further support the conclusion of copying.

Based on the admission of Defendant Katz, the likelihood of access, and the similarities between the works, both in unprotected elements and in protected expression, the Court concludes that the plaintiff has shown a reasonable likelihood of success on the merits as to the fact of copying, both as to the text and the illustrations of the works at issue.

### 3. Ownership

A "certificate of registration *made before or within five years after the first publication* of a work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c) (emphasis added). The Zobel Declaration indicates (albeit in a form that would be inadmissible at trial) that DSE might have copyright registrations in the works at issue. The Declaration fails to provide any indication of when the registered works were first published. Given these two deficiencies, the Court has great discretion in assigning weight to this proof.

Penguin produces evidence that certain elements of Dr. Seuss's works were lost into the public domain during the years 1925 to 1937 when Mr. Geisel worked as freelance artist. Dr. Seuss concedes that the illustration of Maysie Bird appearing in *Horton Hatches the Egg* is within the public domain. In addition, the Court finds evidence that the image of Horton the Elephant from the same work may also be in the public domain, as

---

4. *Narell v. Freeman*, 872 F.2d 907 (9th Cir.1989), is not to the contrary. *Narell* held that defendant's admission that "some" of his language came from plaintiff's work did not prove copying, because the similarities between the two works did not extend to protected expression. *Id.* at 910–12. An admission of copying "some" of a work, like Katz's admission that some illustrations and text were "inspired by" Dr. Seuss's works, does not prove that protected expression was copied. However, the admission provides very good circumstantial evidence that similarities in protected expression that are found arise not from independent creation but from copying.

may the manner of depicting feet, eyes, and smiles found in certain images of the character the Cat in the Hat. Dr. Seuss would retain the right to exclude others from those "increments of expression" that he added in creating his later works. *Silverman v. CBS, Inc.*, 870 F.2d 40, 50 (2d Cir.1989), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989).

Reviewing the similarities described in section 1(b), it appears that the takings noticed in Exhibits 1 and 3 related to elements of the illustration that may have fallen into the public domain. Accordingly, only Exhibit 2 and the text described in section 1(a) evidence takings that might support a finding of infringement.

### 4. Infringement or Fair Use?

Dr. Seuss has produced evidence that protected elements of three copyrighted works were incorporated into Penguin's book. Penguin responds that none of these examples of use could constitute infringement. Citing Professor Nimmer, Penguin argues that copyright infringement exists only in two forms: "comprehensive non-literal similarity" and "fragmented literal similarity." *See* 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* §§ 13.03[A][1]–[2] (1995) [hereinafter Nimmer]. Comprehensive non-literal similarity would be a paraphrasing of an entire work; fragmented literal similarity would be a verbatim or near-verbatim copying of a small part of a work. Only these types of takings, Penguin argues, warrant a finding of infringement.

The Court declines to follow Professor Nimmer's categories. There is no reason prefer the paraphrasing plagiarist to the slavish copyist. In the Ninth Circuit, the issue is whether the works are substantially similar. Substantial similarity may be found whenever the works share significant similarity in protected expression both on an objective, analytical level and a subjective, audience-response level. *See Sid & Marty Krofft*, 562 F.2d at 1164 (setting forth objective "extrinsic" test and subjective "intrinsic" test); *Shaw v. Lindheim*, 919 F.2d 1353,

1357 (9th Cir.1990) (clarifying that "the two tests are more sensibly described as objective and subjective analysis of *expression*") (emphasis in original).

The character the Cat in the Hat, and its manner of depiction, are a significant part of the book *The Cat in the Hat*. Once it makes its appearance, the character appears in nearly every illustration until it exits. The narrator and his sister sit idle at the window until the cat arrives, and after it leaves: the entire book centers drawings of the character and its exploits. Similarly, the text taken from *Horton Hatches the Egg* is the central rhyme and theme of the original work. The text taken from *One fish two fish red fish blue fish*, however, is not a significant part of the text of that work, even though it is the title. The book is a basic children's reader: the initial rhyme is never repeated or referred to in the remainder of the work. Thus only the takings from *The Cat in the Hat* and *Horton Hatches the Egg* could constitute takings substantial enough to warrant a finding of infringement.

Even as to these works, however, Penguin's takings might be excused under the fair use doctrine. Fair use is an "equitable rule of reason," *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), requiring careful balancing of multiple factors "in light of the purposes of copyright." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, ——, 114 S.Ct. 1164, 1171, 127 L.Ed.2d 500 (1994). Section 107 of the copyright code sets forth a nonexclusive list of four factors to assist courts in making this policy-based, fact-sensitive inquiry:[5] "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

5. "Fair use is a mixed question of law and fact." *Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985).

■ Dr. Seuss argues initially that fair use does not apply to satires, but rather only to true parodies.[6] Penguin responds that all satirical uses are entitled to equal consideration under the fair use factors.

■ Justice Kennedy's concurrence in *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), the Supreme Court's first discussion on parody and its most recent treatment of fair use, directly supports Dr. Seuss's argument. *Campbell*, 510 U.S. at ——, 114 S.Ct. at 1180 (Kennedy, J., concurring) ("[P]arody may qualify as fair use only if it draws upon the original composition to make humorous or ironic commentary about that same composition."). This was also the rule in the Second and Ninth Circuits prior to *Campbell*. *See Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir.1986) ("[A] humorous or satiric work deserves protection under the fair-use doctrine only if the copied work is at least partly the target of the work in question.") (citations omitted).

The *Campbell* majority does not clearly support either side of the argument. *Compare Campbell*, 510 U.S. at ——, 114 S.Ct. at 1172 ("[T]he claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)" if work does not have "critical bearing on the substance or style of the original composition"); *id.* at ——, 114 S.Ct. at 1173 (characterizing existence of "parodic character" as "[t]he threshold question when fair use is raised in defense of parody"); *with id.* at —— n. 14, 114 S.Ct. at 1172 n. 14 ("When there is little or no risk of market substitution ... taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use ..."); *id.* at ——, 114 S.Ct. at 1170 ("The task [of deciding what is fair use] is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis.").

The Court agrees with Dr. Seuss that generally, and on the facts of this case, the former Ninth Circuit rule should apply.

■ Satires and parodies are generally of popular media (songs, books, or movies). These media generally have very high levels of expressive content and are therefore at the very core of copyright.[7] Satires and parodies by definition evoke the original work, which often requires taking the very heart of the infringed work, also cutting against a finding that the use is fair.[8]

■ While a general satire of social conditions is certainly a creative work having social value,[9] the potential satirist has many alternatives to pilfering the protected expression of a copyrighted work, rendering the choice to adopt the protected elements of a work currently enjoying copyright protection an unreasonable attempt to cash in on anoth-

**6.** Parody appropriates commonly known elements of a prior work to make humorous or critical comment on *that same work*, whereas satire commonly known elements of a prior work to make humorous or critical comment on *another subject*. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, ——, 114 S.Ct. 1164, 1172, 127 L.Ed.2d 500 (1994) ("For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.").

**7.** The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, ——, 114 S.Ct. 1164, 1175, 127 L.Ed.2d 500 (1994). Core works are afforded stronger pro-

tection, and infringing use is more difficult to justify as fair. *Id.* Because most parodies are of popular songs or novels, creative products very close to the core of copyright, this factor provides little guidance in "separating the fair use sheep from the infringing goats in a parody case ..." *Id.*

**8.** The third fair use factor calls for analysis of both the quantity and the quality of the materials taken: fair use would more likely be denied an infringer who took only a few elements if those elements were the central elements of the copyrighted work. *Campbell*, 510 U.S. at ——, 114 S.Ct. at 1176.

**9.** The first fair use factor, the nature and purpose of the use, looks to the social value of permitting the infringing use. *See Campbell*, 510 U.S. at ———— ———, 114 S.Ct. at 1171–72.

er's creativity.[10] The satirist (or one intending to parody an author but not any particular work) may freely evoke another artist by using the artist's general style.[11] The satirist may also freely plunder the myriad familiar works already in the public domain through the expiration of copyright protection. Only when the satirist wishes to parody the copyrighted work itself does the taking of protected expression from that work become permissible, and even then, only in such amounts as is required to fulfill the parodic purpose.[12] Of course, allowing free taking of distinctive elements from a work in current favor might produce a more effective satire. The court, however, must balance the interests of the public, the copyright owner, and the parodist. *Cf. Walt Disney Prods.,* 581 F.2d at 758 (the parodist's "desire to make the 'best parody' is balanced against the right of the copyright owner in his original expressions.").

In striking this balance, the court must give primary consideration to the Framers' belief that copyright monopolies increase welfare by encouraging creators of new expressive works. *See Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful Arts.' "); *see generally* William M. Landes & Richard A. Posner, *An Economic Analysis of Copyright Law,* 18 J. Legal Stud. 325 (1989). The most significant consideration in making the fair use determination is therefore the impact of the infringing use on the market for the original, including the market for derivative works of the original. *See Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233 (impact on market is "undoubtedly the single most important element of fair use."); *id.* at 568, 105 S.Ct. at 2234 (court should "take account not only of harm to the original but also of harm to the market for derivative works.").

Both satire and parody are "transformative" uses posing little threat of displacing[13] the demand for the *original* work. *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1177. As to *derivative* works, however, while an author might license a satirist's use of his work, *see, e.g., New Line Cinema Corp. v. Bertlesman Music Group, Inc.,* 693 F.Supp. 1517 (S.D.N.Y.1988) (creators of "Nightmare on Elm Street" movie series licensed derivative use of movie characters to rap group "Fat Boys," and sued infringing user rapper "D.J. Jazzy Jeff"), the law presumes a reluctance to license parodists, persons whose purpose it is to ridicule the author's work. *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1178 ("[T]he unlikelihood that creators of imaginative

---

**10.** The existence of alternative means of expression also eliminates any argument that fair use must be extended to all cases of satire to avoid conflict between the copyright statute and the First Amendment. *See Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 759 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

**11.** General style, not fixed in any single work, may not be protected. *See* 17 U.S.C. § 102(a) (limiting copyright protection to "original works of authorship fixed in a tangible medium of expression"); Richard A. Posner, *When is Parody Fair Use?,* 21 J. Legal Stud. 67, 68 (1992) (a writer's general style established across a body of work is not copyrightable).

**12.** The substantiality of the copying should be balanced against the substantiality of the targeting of the original work. *Campbell,* 510 U.S. at ——, 114 S.Ct. at 1176 (not everyone "who calls himself a parodist can skim the cream and get away scot free"; copying must be compared to "parodic purpose"); *Walt Disney Prod.,* 581 F.2d at 758. The amount required will vary by "the degree of public recognition of the original work, the ease of conjuring up the original work in the chosen medium, and the focus of the parody." *Fisher v. Dees,* 794 F.2d 432, 439 (9th Cir.1986).

**13.** The negative impact created by the criticism of the original in the parody is not relevant to the fair use analysis. *See Campbell,* 510 U.S. at ——, 114 S.Ct. at 1178 ("Because parody may quite legitimately aim at garotting the original, destroying it commercially as well as artistically, the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps it.") (internal quotations and citations omitted); *Fisher,* 794 F.2d at 438 ("[T]he economic effect of a parody with which we are concerned is not its potential to destroy or diminish the market for the original—any bad review can have that effect—but rather whether it *fulfills the demand* for the original.").

works will license critical reviews or lampoons of their own products removes such uses from the very notion of a potential licensing market."); *see also Fisher,* 794 F.2d at 437 ("Parodists will seldom get permission from those whose works are parodied. Self-esteem is seldom strong enough to permit the granting of permission even in exchange for a reasonable fee."). Thus while the unlicensed satirist deprives the author of potential license fees for derivative works, the parodist is presumed to operate within a market imperfection.

■ In sum, satire and parody are generally egregious forms of infringement, taking the best elements of the most expressive works. The choice to take protected elements from a copyrighted work is reasonable and fair only when it is necessary. It is necessary only when one of the targets of the satirist is the work itself, because only then is it fair to presume that the satirist has no alternative to infringement, and only then is it fair to presume that the author would not profit from the granting of a license. The reasonableness extends only to that appropriation of the original that is required to fulfill the parodic purpose.

Both *The Cat in the Hat* and *Horton Hatches the Egg* are highly expressive works. From both Penguin took a highly significant part: from *The Cat in the Hat* the central character illustration, and from *Horton Hatches the Egg* the central rhyme. Therefore the premises of the above analysis apply on the facts of this case, and the second and third fair use factors clearly weigh against a finding of fair use. Whether Penguin's use is fair depends purely upon the purpose of its use and the effect of the use on the market for original.

As to *The Cat in the Hat,* Penguin argues that its takings should be excused because its book "suggest[s] that the Seussian imagination, however, wide-ranging, was too limited to conceive the possibility of a real trickster cat who creates mayhem along with his

friends Thing 1 and Thing 2, and then magically cleans it up at the end, leaving a moral dilemma in his wake." Decl. of Alan Katz in Supp. of Opp. to Prelim. Inj., ¶ 3. The Court finds this completely unconvincing.

Courts have allowed parody claims only where there was a discernable direct comment on the original. The words and music of the parody in *Campbell* directly targeted the original song, expressing the rap group's scorn for "the white-bread original," "remind[ing] us that sexual congress with nameless streetwalkers is not necessarily the stuff of romance and is not without its consequences." *Acuff-Rose Music, Inc. v. Campbell,* 972 F.2d 1429, 1442 (6th Cir.1992) (Nelson, J., dissenting), *rev'd,* 114 S.Ct. 1164 (1994); *see also Campbell,* 510 U.S. at ——, 114 S.Ct. at 1173 (rap version could be taken as "a rejection of [the prior work's] sentiment that ignores the ugliness of street life and the debasement that it signifies."). In *Fisher v. Dees,* the parody "When Sonny Sniffs Glue" poked fun at the original "When Sunny Gets Blue" by mocking both its lyrics and the "rather singular vocal range" of the original performer. 794 F.2d at 436. In *Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741 (S.D.N.Y.), *aff'd,* 623 F.2d 252 (2d Cir.1980) (per curiam), the song "I Love Sodom" parodied both the song "I Love New York" and the city's advertising campaign.[14]

The Court discerns no similar attempt to comment upon the text or themes of *The Cat in the Hat.* "Suggesting limits to the Seussian imagination" is simply inadequate: that statement could be made about *any* satire, that the new work seeks to "suggest the limits of the prior author's imagination" by deploying the essence of the prior work in a new setting. *See Campbell,* 510 U.S. at ——, 114 S.Ct. at 1181 (Kennedy, J., concurring) (cautioning against allowing vague claims of "comment on the naivete of the original").

---

**14.** Penguin's reliance on the dictum in that case, which stated that the criticism of the original work was not essential to the finding of fair use, is ill-advised in light of the Second Circuit's express rejection of that dictum in *MCA, Inc. v. Wilson,* 677 F.2d 180, 185 (2d Cir.1981) (rejecting the parody claim of "The Cunnilingus Champion of Company C" as to original work "Boogie Woogie Bugle Boy of Company B").

However, as to the work *Horton Hatches the Egg,* Penguin produces a viable claim of parody.

The work *Horton Hatches the Egg* traces the travails of Horton the Elephant. Lazy Maysie Bird has tired of the hard work of egg-hatching. Promising to return quickly, she tricks Horton into agreeing to babysit her egg. Horton stays unbendingly faithful through storms, ridicule, seasickness, and being made a circus exhibit, and is ultimately rewarded for his faithfulness.

*The Cat Not in the Hat* has Kato Kaelin grooming himself in a tree with a Maysie Bird wearing the "Dr. Juice" hat flying contentedly nearby. The text and illustration suggest a comparison between Kato's testimony during the Simpson trial and Horton's sitting on the egg. In making this comparison, Defendant Katz claims that he meant in part to criticize the original work's endorsement of unquestioning faithfulness. This claim cannot be rejected on its face, *see Campbell,* 510 U.S. at ——, 114 S.Ct. at 1173 (issue is "whether a parodic character may reasonably be perceived"), and it appears that Penguin's work takes no more of the original than it required to make the comparison described above.

Accordingly, while Dr. Seuss demonstrates a likelihood of success on the merits as to the claim of infringement of *The Cat in the Hat,* it fails to demonstrate a likelihood of success as to *One fish two fish red fish blue fish* or *Horton Hatches the Egg.*

### B. Trademark Claims

To show trademark infringement, the plaintiff must show (1) ownership of a protectible trademark and (2) likelihood of consumer confusion. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 841 (9th Cir.1987).[15]

---

**15.** This section will also deal with the unfair competition claim, the contours of which plaintiff describes as "substantially congruent" to a trademark infringement claim under the Lanham Act. Mot. at 20.

**16.** Dr. Seuss's argument that it need not prove likelihood of confusion because of the threat of tarnishment is incorrect. The *Coca–Cola* case,

### 1. Ownership of Protectable Mark

Plaintiff accuses Defendant of misappropriating seven marks: (1) the words "Dr. Seuss," (2) the words "The Cat in the Hat," (3) the character illustration "The Cat in the Hat," (4) the design of the cat's stove pipe hat, (5) the character illustration "Horton the Elephant," (6) the character illustration "Maysie Bird," and (7) the character illustration "Sam I Am." Defendants do not contest Plaintiff's ownership of common law rights to these marks.

### 2. Likelihood of Confusion [16]

Consumer confusion must be probable, not merely possible. *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). The Ninth Circuit evaluates likelihood of confusion by reference to (1) the strength of the mark, (2) similarity between the mark and the infringing item, (3) evidence of actual confusion, (4) marketing channels used, (5) the type of goods and likely degree of consumer care, and (6) the defendant's intent in selecting its marks. *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 616 (9th Cir.1989).

Trademarks gather strength over time, through advertising, through public recognition, and through distinctiveness. *Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 506 (9th Cir.1991). The fact of copying, admitted in any parody case, is itself evidence of the strength of the marks. *See Vision Sports,* 888 F.2d at 615 (copying is strong evidence of secondary meaning). Defendants do not contest that Plaintiff's marks are "widely recognized." Opp. at 13–14.

Similarity is to be judged not by "a simple, visual side-by-side comparison but rather the mark and the imitation should be viewed in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods."

cited for the proposition that plaintiff "need not even prove or rely on a likelihood of consumer confusion," actually found and relied upon plaintiff's "clear showing" of a "high probability of confusion" as to sponsorship of the defendant's use of the mark. *Coca–Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1190 (E.D.N.Y. 1972).

*Walt Disney Prods.*, 581 F.2d at 759. The covers look similar, given the taking of (1) certain features of the Cat in the Hat resulting in similarities between it and the figures on the front and back of the infringing work (see Exhibits 1 and 2); (2) the stove pipe hat; (3) the narrator ("Dr. Seuss" versus "Dr. Juice"); and (4) the title (*The Cat in the Hat* versus *The Cat Not in the Hat!* ).[17] However, Penguin's book is prominently subtitled "A Parody," and the author is described as "By Dr. Juice *as told to Alan Katz and Chris Wrinn.*" A circular red sticker on the back cover disclaims any relationship between *The Cat Not in the Hat* and Dr. Seuss. Given that books are mixed search-experience goods that are generally perused but not fully inspected before purchase, the Court finds the second factor indeterminate.[18]

There is no evidence of actual confusion.

The fourth and fifth factors are also indeterminate. Although both will be sold through popular bookstores, Dr. Seuss's books are targeted at children and will be contained in the children's sections, whereas Penguin's book is targeted at adults and will be sold in current interest or humor sections. However, Penguin concedes that its book might also be placed in prominent displays: this raises the possibility that young persons more likely to be confused could be exposed to the infringing use.

Finally, as to intent, although Penguin has intentionally produced a parody, that should not weigh against it unless its intent was to confuse as to source. On the other hand, if no significant steps were taken by the defendant to reduce the chance of consumer confusion, it can be inferred that the defendant was at least indifferent to this possibility, and the factor will weigh against it. *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 774–75 (8th Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995). The prominent labeling of the work

as "A Parody," and the disclaimer sticker on the back indicate that this factor should weigh in favor of Penguin.

Weighing all the factors, limiting consideration to just these marks and not the other similarities in trade dress,[19] the Court finds that the plaintiff's showing raises serious questions for litigation, but does not establish a reasonable likelihood of success on the merits.

3. Possible First Amendment Defense

The Ninth Circuit has not explicitly considered whether and how noncommercial speech may be regulated by the Lanham Act. At least three approaches may be discerned in the cases.

The first approach dismisses First Amendment concerns where "alternative avenues of communication" exist that might have been selected by the infringer to convey its message. *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir.1979). This approach has been criticized as insufficiently sensitive to the notion that the form of expression may be essential to the message sought to be conveyed. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989) (rejecting "no alternative" standard; citing *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971) ("[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing the ideas in the process.")). However, this approach bears close resemblance to traditional time, place, and manner analysis, and has been deployed by the Supreme Court in two closely-related decisions on the competing interests of property owners and the First Amendment. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 541, 107 S.Ct. 2971, 2983, 97 L.Ed.2d 427 (1987) [hereinafter *SFAA* ] ("The mere fact that the SFAA claims an expressive, as op-

---

17. The remaining three marks do not add appreciably to the likelihood of confusion.

18. Search goods are goods whose quality consumers can inspect and investigate before purchase. Experience goods, by contrast, may be evaluated only after purchase and consumption. *See generally* Phillip Nelson, *The Economic Con-*

sequences of Advertising, 48 J.Bus. 213 (1975); Phillip Nelson, *Advertising as Information,* 82 J.Pol.Econ. 729 (1974); Phillip Nelson, *Information and Consumer Behavior,* 78 J.Pol.Econ. 311 (1970).

19. Dr. Seuss has not raised a trade dress claim in its complaint or its moving papers.

posed to a pure commercial, purpose does not give it a First Amendment right to 'appropriat[e] to itself the harvest of those who have sown.'") (internal citations omitted); *id.* at 536, 107 S.Ct. at 2981 ("By prohibiting the use of one word for particular purposes, neither Congress nor the USOC has prohibited the SFAA from conveying its message. The SFAA held its athletic event in its planned format under the names 'Gay Games I' and 'Gay Games II' in 1982 and 1986, respectively.... Section 110 restricts only the manner in which SFAA may convey its message."); *Lloyd Corp. v. Tanner,* 407 U.S. 551, 566–67, 92 S.Ct. 2219, 2227–28, 33 L.Ed.2d 131 (1972).

The second approach balances the "the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes v. Bantam Doubleday Dell Publishing Group,* 886 F.2d 490, 496 (2d Cir.1989); *accord Anheuser–Busch,* 28 F.3d at 776. The Second Circuit originated this approach in *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir.1989). In *Rogers,* the court held that although the defendant's movie title was artistic expression deserving First Amendment protection, the fact that it was sold in the commercial marketplace made the "danger of consumer deception a legitimate concern that warrants some governmental regulation." *Id.* at 997. The court cited as support for this proposition *Central Hudson Gas & Electric v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) and *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272 (2d Cir.1981). However, the proposition taken from *Central Hudson,* that "government may ban forms of communication more likely to deceive the public than inform it," 447 U.S. at 563, 100 S.Ct. at 2350, described the lower standard of protection accorded *commercial* speech; it did not state any general proposition as to governmental authority to ban misleading *noncommercial* speech. *Id.* at 562–63, 100 S.Ct. at 2349–50. *Vidal Sassoon* dealt with an advertisement, also a clear form of commercial speech. 661 F.2d at 276 n. 8. Thus the Second Circuit's gen-

eration of this balancing test for noncommercial speech must be viewed as entirely *sui generis.* The Eighth Circuit's unquestioning adoption of it is not very persuasive; both its decision to apply the test and its determination that a likelihood of confusion existed are rather questionable. *See Anheuser–Busch,* 28 F.3d at 774–77.

The third approach calls for a straightforward refusal to apply the Lanham Act to noncommercial speech. *See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 33 (1st Cir.1987) ("The legitimate aim of the anti-dilution statute is to prohibit the unauthorized use of another's trademark in order to market incompatible products or services. The Constitution does not, however, permit the range of the anti-dilution statute to encompass the unauthorized use of a trademark in a noncommercial setting such as an editorial or artistic context."), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

When the purpose of the use of the trademark is to comment upon the mark itself, there is no alternative to use, *compare Dallas Cowboys,* 604 F.2d at 206, and no intent to market incompatible goods or services, *compare L.L. Bean,* 811 F.2d at 33. Thus a pure parody should be protected under either the first or third regime. The two approaches diverge when, as in this case,[20] the purpose of the use of the mark is to comment upon another issue. Even if the use would also increase the sales of the commentary, the use remains noncommercial. *See Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976) (defining commercial speech as "speech which does no more than propose a commercial transaction"); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 66–67, 103 S.Ct. 2875, 2879–80, 77 L.Ed.2d 469 (1983) (analyzing commercial and noncommercial elements of speech to determine which predominated). The first approach would deny the use of the mark First Amendment pro-

---

**20.** Although Penguin's use of these marks is in part designed to further the sales of its book, the use also has expressive content in that it attempts to comment humorously upon the O.J. Simpson trial through the disjunctive effect wrought by the use of these obviously displaced symbols.

tection, while the third would deny the Lanham Act coverage over the use.

The Court feels that the weight of Supreme Court authority indicates that it would favor adoption of the first approach as adequately accommodating the narrow instances when trademark protection cannot be viewed as a reasonable time, place, or manner restriction. *See SFAA,* 483 U.S. at 536, 541, 107 S.Ct. at 2981, 2983 (implying trademark protection can be viewed as a reasonable time, place, or manner restriction); *cf. Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 575, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977) ("[W]e are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer's entire act without his consent. The Constitution no more prevents a State from requiring respondent to compensate petitioner for broadcasting his act on television that it would privilege respondent to film and broadcast a copyrighted dramatic work without liability to the copyright owner; or to film and broadcast a prize fight; or a baseball game, where the promoters or the participants had other plans for publicizing the event.") (internal citations omitted).

■■■ Just as in copyright, trademark infringement will be excused only where necessary to the purpose of the use.[21] Where alternative means of achieving the satiric or parodic ends exist that would not entail consumer confusion,[22] the First Amendment will not protect the parodist from being held to infringe. The Court's reasoning as to the fair use defense therefore applies equally to this issue. Dr. Seuss would most likely prevail at trial against a First Amendment defense.

#### 4. Conclusion as to Trademark Claim

Plaintiff has shown ownership of trademarks entitled to protection; a possibility of confusion stemming from defendant's use of the mark; and a likelihood that a First Amendment defense would be overcome at trial.

#### C. Federal Trademark Dilution Law

■■■ Dr. Seuss has also requested relief under the Federal Trademark Dilution Act of 1995, effective as of January 16, 1995. Federal Trademark Dilution Act of 1995, § 5, Pub.L. No. 104–98, 109 Stat. 985 (codified at 15 U.S.C. §§ 1125(c), 1127) (the "Act").

Dilution differs from traditional trademark theory in one very significant way: the plaintiff need not show likelihood of confusion. *See* 15 U.S.C. § 1127 (defining "dilution" as "lessening the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of ... likelihood of confusion, mistake, or deception"). The Act explicitly bars dilution through loss of distinctiveness. *Id.* The legislative history supports the conclusion that Congress also intended the Act to cover dilution through tarnishment. *See* 141 Cong. Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch) ("[T]his bill is designed to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it ...").

The Act entitles the owners of "famous marks" to nationwide injunctive relief against uses that would tend to "dilute" the mark. 15 U.S.C. § 1125(c)(1). Further remedies are available if the infringing use was "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark." 15 U.S.C. § 1125(c)(2). Sub-sections 1125(c)(1)(A)–(H) provide various factors to determine whether a mark qualifies as a "famous mark."

Penguin does not dispute that the marks associated with *The Cat in the Hat* are famous marks. Rather, Penguin argues that the Act does not apply to its use of the mark

---

**21.** The answer to Dr. Seuss's argument that it has a constitutional right not to have its trademark used is subsumed within this reasoning. Dr. Seuss's right, whether rooted in property or the First Amendment right to not speak, would bow to the public's interest in free dissemination of ideas where a speaker sought to criticize the trademark itself.

**22.** It should usually be possible to achieve the parodic purpose while simultaneously labeling the parody in such a manner as to prevent consumer confusion as to sponsorship, so even a true parody should face a more limited privilege in trademark than copyright.

because of the exception contained in section 1125(c)(4)(B), which permits "noncommercial use of a mark." Dr. Seuss replies that Penguin's use cannot be accepted as "noncommercial" because the marks were used "to make their book more entertaining and to consequently, sell more copies." Reply at 15. The Court rejects Dr. Seuss's narrow interpretation of this exception.

Section 1125(c)(4)(B) was defined by Senator Hatch in introducing the bill to include "parody, satire, editorial and other forms of expression that are not part of a commercial transaction." 141 Cong.Rec. S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch). As indicated in section II.B.3, an expressive use is not rendered commercial by the impact of the use on sales. *Virginia Pharmacy Bd.*, 425 U.S. at 762, 96 S.Ct. at 1825–26 (commercial speech merely proposes a commercial transaction). The Court therefore holds that the First Amendment would apply to this use of the trademarks at issue, and that as an expressive use, this use is exempt from the reach of the Federal Trademark Dilution Act.

## IV. IRREPARABLE INJURY

■ In copyright and trademark cases, irreparable injury is presumed upon a showing of likelihood of success. *See Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 525 (9th Cir.1984) (copyright); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1220 (9th Cir.1987) (trademark). Thus if the plaintiff's showing satisfies the "likelihood of success" standard, preliminary injunctive relief would be justified. The Court finds that Dr. Seuss's copyright claim satisfies this standard.

Dr. Seuss's trademark claim, although falling short of the above standard, does raise serious questions providing a fair basis for litigation. Under this formulation of the Ninth Circuit test, if the balance of hardships favors the plaintiff, the plaintiff would be entitled to preliminary injunctive relief notwithstanding his failure to prove a likelihood of success on the merits.

## V. BALANCE OF HARDSHIPS

■ The balance of hardships cuts decidedly in favor of the plaintiff. The works of Dr. Seuss are associated with genuine wit, inventiveness, and wholesomeness. The infringing work appears to fall rather short of its billing as "wickedly clever," and deals in macabre humor about an infamous and gruesome double murder whose implications for those involved, and for the nation, remain yet to be worked out. Plainly, plaintiff is threatened with the prospect of immediate and irreparable harm to its interests by the further advertising and sales of the Defendant's work. *Cf. Gilliam v. American Broadcasting Co.*, 538 F.2d 14, 19 (2d Cir.1976) (nationwide broadcast of edited versions of Monty Python comedy group's programs caused irreparable injury to their professional reputation with an audience then unfamiliar with them). Defendant, on the other hand, faces only the prospect of advertising and sales put off until trial. The O.J. Simpson murder trial ended months ago, and the civil trial has yet to commence; timeliness is not a great concern. Defendant may lose some profits and goodwill with distributors, but "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988) (internal quotation marks and citation omitted). Finally, while these copyrights and trademarks form the essence of Dr. Seuss's business, the infringing work is but one of many ventures by Penguin. *See Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc.*, 776 F.Supp. 1454, 1463 (W.D.Wash.1991) (where defendant's overall business would not be significantly impacted by injunction, "the balance of hardships tips decidedly in favor of" the plaintiff). For all these reasons, the Court finds that the equities favor granting the injunction.

## VI. PRIOR RESTRAINT

■ As a last resort, Penguin argues that issuance of a preliminary injunction against its work would constitute a prior restraint in

violation of the First Amendment. The Court rejects this argument.

Penguin's book is undoubtedly noncommercial speech entitled to full First Amendment protection. However, enforcement of the copyright code is a long-sanctioned means of securing the important governmental interests underlying the copyright code. Copyright law accommodates the concerns of the First Amendment through its exclusion of protection for ideas, and through the fair use doctrine. *See Sid & Marty Krofft,* 562 F.2d at 1170 ("[T]he idea-expression dichotomy already serves to accommodate the competing interests of copyright and the first amendment. The 'marketplace of ideas' is not limited by copyright because copyright is limited to protection of expression."); *New Era Pubs. Int'l v. Henry Holt & Co.,* 873 F.2d 576, 584 (2d Cir.1989) (rejecting district court's First Amendment rationale for denying preliminary injunction because "the fair use doctrine encompasses all claims of first amendment in the copyright field," and "[a]n author's expression of an idea, as distinguished from the idea itself, is not considered subject to the public's 'right to know' "), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990); *cf. Harper & Row* 471 U.S. at 560, 105 S.Ct. at 2230 ("In light of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use, we see no warrant for expanding the doctrine of fair use ..."); *Zacchini,* 433 U.S. at 577 n. 13, 97 S.Ct. at 2858 n. 13 ("We note that Federal District Courts have rejected First Amendment challenges to the federal copyright law on the ground that 'no restraint [has been] placed on the use of an idea or concept.' "); *New York Times Co. v. United States,* 403 U.S. 713, 726 n. *, 91 S.Ct. 2140, 2147 n. *, 29 L.Ed.2d 822 (1971) (Brennan, J., concurring) (copyright cases inapposite to prior restraint discussion because copyright cases deal with restraint of form of expression, not the ideas expressed). The Supreme Court has shown no receptivity to First Amendment arguments in the copyright context; to the contrary, it has noted that "the Framers intended copyright itself to be the engine of free expression" by supplying "the economic incentive to create and disseminate ideas." *Harper & Row,* 471 U.S. at 558, 105 S.Ct. at 2229. Although it is possible that some rare newsworthy photograph or work might require copyright to temporarily step aside in the interest of the First Amendment, this is not that case.

Nor does the argument gain any additional weight when addressed to the Lanham Act. *See Dallas Cowboys Cheerleaders,* 604 F.2d at 206 ("The prohibition of the Lanham Act is content neutral ... and therefore does not arouse the fears that trigger the application of constitutional 'prior restraint' principles."); *cf. SFAA,* 483 U.S. at 536, 107 S.Ct. at 2981 (trademark protection limits only manner of conveying message, not message itself); *Lloyd Corp.,* 407 U.S. at 566–67, 92 S.Ct. at 2227–28.

## VII. AMOUNT OF THE BOND

Rule 65(c) requires the applicant to post a security "in such sum as the court deems proper." Fed.R.Civ.P. 65(c). Generally this means an amount sufficient to cover the defendant's incidental and consequential costs arising from the injunction, although the court may specify a lesser amount when the plaintiff is unable to provide sufficient security. 11A Wright, § 2954 at 292–300.

Penguin submits evidence that it has already incurred approximately $35,000 in sunk costs toward production. 6,000 of the initial printing of 12,000 units have already been sold evidencing a possible loss of $24,000 at $4.00 in profits per unit. The Court therefore sets the amount of the bond at $70,000.

## VIII. CONCLUSION AND ORDER

Dr. Seuss has made a strong showing as to its copyright claims, and has raised serious questions providing a fair basis for litigation as to its trademark claims. The balance of the hardships tips markedly in its favor. A likely copyright infringement appears on the back cover of Penguin's work, and instances of possible trademark infringements of the stove pipe hat appear on the front and back covers and throughout the work.

**1576**

Defendants are therefore enjoined, pending trial of this action, from directly or indirectly printing, publishing, delivering, distributing, selling, transferring, advertising, or marketing the book *The Cat Not in the Hat! A Parody by Dr. Juice.*

This order shall bind the parties, their officers, agents, servants, employees, and attorneys, and all those who would act in concert with them after receiving actual notice of this order. Fed.R.Civ.P. 65(d).

**IT IS SO ORDERED.**

EXHIBIT 1

EXHIBIT 2

$7.95 ($9.99 CAN)

In this wickedly clever and hilariously funny rendition of the O.J. Simpson trial, Dr. Juice recounts in rhyming verse the highlights of the case and the personalities involved. Beginning in Brentwood, the "happy town inside L.A., where rich folks play the day away," it moves on to the Bronco chase with "A pal named Al," and Kato Kaelin, "a house guest [who] is faithful one hundred percent." From the cases presented by Marcia Clark and the Dream Team, to the witnesses and jury "Injury. Perjury. His jury. Her jury," and the verdict that decrees "The Cat goes free..." *The Cat NOT in the Hat* is pure poetry, a fresh new look at a much told tale that trial watchers everywhere will enjoy.

EXHIBIT 3

Oh, Kato was eager when he testified.
Though O.J.'s good pal, he couldn't have lied.
He spoke his mind fully.
He said what he meant.
A houseguest is faithful
One hundred percent.

EXHIBIT4

EXHIBIT 5

EXHIBIT 6

EXHIBIT 7

EXHIBIT 8

# THE CAT NOT IN THE HAT

## By Dr. Juice
### As told to Alan Katz and Chris Wrinn

A PARODY

Wickedly clever author "Dr. Juice" gives the O.J. Simpson trial a very fresh new look. From Brentwood to the Los Angeles County Courthouse to Marcia Clark and the Dream Team, *The Cat Not in the Hat* tells the whole story in rhyming verse and sketches as witty as Theodore Geisel's best. This is one parody that really packs a punch!

*A bloody glove*
*A glove with blood*
*Found near the AC that went "Thud!"*
*"Aha!" said Furhman, Detective, L.A.*
*I just picked up Exhibit A ...*

*"The Juice is loose!"*
*The sports fans howl*
*He's taking off with his pal Al*
*A pal named Al can save the day*
*When you try to get away ...*

Hardcover Book • 6 X 9 • 48 pages • ISBN 0-7871-0956-8 • $7.95 ($9.99 CAN)
6-copy counter display • ISBN 0-7871-0958-4 • $39.75 (Six books for the price of five)

Please send:
____ 0-7871-0956-8 THE CAT NOT IN THE HAT• $7.95 ($9.99 CAN) (Book)
____ 0-7871-0958-4 THE CAT NOT IN THE HAT• $39.75 (6-copy counter display)

**MAJOR NATIONAL PUBLICITY AND ADVERTISING**
· $50,000 Promotional and Advertising Budget
2-COLOR ILLUSTRATION THROUGHOUT
Order due date Jan. 31, 1996

PENGUIN USA • Dove

CENTRAL ORDER PROCESSING

Penguin USA offers free freight on orders of ten or more books