**ROSEN ENTERTAINMENT SYSTEMS, LP,**
**Plaintiff,**

v.

**EIGER VISION and Does 1–10, Defendants.**

**No. EDCV 04–1045 RT.**

United States District Court, C.D. California.

Oct. 12, 2004.

Bruce D. Jobse, M. Lawrence Oliverio, Paul E. Kudirka, Paul D. Sorkin, Kudirka & Jobse, Boston, MA, Cara R. Burns, Robert H. Garretson, III, Hicks Mims and Kaplan, Los Angeles, CA, for Plaintiff.

Don Hyun Min, Mark B. Mizrahi, Robert Jacobs, Belasco Jacobs & Townsley, Los Angeles, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

TIMLIN, District Judge.

The court, Judge Robert J. Timlin, has read and considered Plaintiff Rosen Entertainment Systems ("Rosen")'s application for a preliminary injunction against Defendant Eiger Vision ("Eiger"), Eiger's oppo-

sition, and Rosen's reply.[1] Based on such consideration, the court concludes as follows:

## I.

### BACKGROUND

Rosen is a limited partnership based in Corona, California. The entirety of Rosen's business is the design, manufacture, and sale of overhead flip-down video display units for installation in automobiles. Rosen owns United States Patent Nos. 5,946,055 ("'055 patent"); 6,124,902 ("'902 patent"); 6,115,086 ("'086 patent"); 6,246,-449 B1 ("'449 patent"); and 6,059,255 ("'255 patent"). All five of these patents are variations or components of overhead flip-down video display units for installation in automobiles ("automotive display unit"). In addition, Rosen has approximately thirty-five other patents and thirteen patents pending in the automotive display field.

Eiger Vision is a sole proprietorship registered to Dong Suk Kim. Its principal place of business is North Hollywood, California. Eiger describes itself as a distributor and also claims to invest in research and development.

Sometime before April 2, 2004, Rosen became aware of Eiger's allegedly infringing products. On April 2, 2004, Rosen sent Eiger a letter informing Eiger of Rosen's rights under the patents and demanded that Eiger cease and desist its infringing activity. Alternatively, Rosen offered Eiger a license at a "reasonable royalty rate." On June 30, 2004, after Rosen claims it had not received a response from Eiger, Rosen sent Eiger another letter repeating its position. The letter gave Eiger until July 15, 2004, to enter a licensing agreement with Rosen or to cease and desist. The licensing agreement attached to the letter appears to require a royalty between 2% and 3% of Eiger's gross sales of Rosen's patented products.

Rosen and Eiger never reached an agreement. Rosen claims that Eiger "imports wholesale knock-offs." The knock-offs are allegedly manufactured by a Korean manufacturer, Movidic. Movidic purportedly disregards United States patents. Rosen is at a key juncture because Eiger has just entered into a nationwide, market penetrating agreement for its products with AAMP of America ("AAMP"). Moreover, Rosen asserts that because Eiger does not innovate or develop any new products, it can afford to underprice its products and gain a major market share. Rosen claims that Eiger's underpricing is eroding their market at a time when the market for Rosen's patented design is just beginning to mature.

On August 20, 2004, Rosen filed a complaint in this court for patent infringement under 35 U.S.C. § 101. Rosen alleges Eiger sold, distributed, imported, and/or manufactured products infringing Rosen's patents. In addition, Rosen alleges that Eiger induced third parties to infringe Rosen's patents. Rosen seeks a judgment declaring infringement by Eiger's products, damages, attorney's fees, and injunctive relief.

On August 20, 2004, Rosen also filed an application for a temporary restraining order ("TRO") and for an order to show ("OSC") cause why a preliminary injunction should not issue. Rosen's TRO sought to enjoin making, importing, using, selling or offering Eiger's allegedly infringing products. This court issued an order on August 25, 2004, denying Rosen's

---

1. The court has also read and considered Rosen's objections to evidence, Eiger's objections to Rosen's reply, Rosen's reply to Eiger's objection to Rosen's reply.

application for a TRO. The court granted Rosen's application for an OSC regarding issuance of a preliminary injunction.

## II.

### EVIDENTIARY OBJECTIONS

#### A. Rosen's Evidentiary Objections

Rosen objects to forty-two portions of various declarations submitted by Eiger. The grounds for these objections are substantially similar with slight variations. For example, Rosen objects to paragraph 2 of Don Min's August 23, 2004 declaration because it is "irrelevant, not material, hearsay not subject to any exception, not based on personal knowledge," incompetent, and erroneous.

■ District courts have discretion to consider otherwise inadmissible evidence in ruling on the merits of an application for a preliminary injunction. *See Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984). In *Flynt*, the Ninth Circuit acknowledged that time constraints may make it difficult to obtain affidavits from persons competent to testify at trial on an application for a preliminary injunction. The court noted that trial courts may give inadmissible evidence some weight in order to prevent irreparable harm before trial. *See id.* (citations omitted).

While *Flynt* pertains to the use of evidence by a plaintiff seeking a preliminary injunction, the court finds the reasoning in *Flynt* equally persuasive for evidence submitted by a defendant. Sustaining Rosen's objections to evidence in opposition to a preliminary injunction would attenuate the ability of the court to determine likelihood of success on the merits before a trial on the merits can take place. This is especially so in a patent infringement action because a showing of a likelihood of success on the merits leads to a presumption of irreparable harm. *See Reebok Int'l. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed.Cir.1994). Thus, the court has the discretion to consider inadmissible evidence in ruling on an application for a preliminary injunction and will exercise such in deciding the following evidentiary objections by Rosen. *Flynt*, 734 F.2d at 1394.

1. Declaration of Don Min, dated August 23, 2004, paragraph 2: overruled;

2. Declaration of Don H. Min, dated September 13, 2004:

 a. paragraph 2: overruled;

 b. paragraph 10: overruled;

 c. paragraph 13: overruled;

 d. paragraph 16: sustained;

 e. paragraph 17: overruled;

 f. paragraph 18: overruled—court will not consider the content of the letter for the truth thereof;

 g. paragraph 19: overruled;

 h. paragraph 20: overruled;

 i. paragraph 21: overruled

3. Declaration of Kyung–Soo Park, dated September 2004:

 a. paragraph 6: overruled;

 b. paragraph 7: overruled;

 c. paragraph 8: overruled;

 d. paragraph 9: overruled;

4. Declaration of Jesse Choi, dated August 23, 2004:

 a. paragraph 2: overruled;

 b. paragraph 3: overruled;

 c. paragraphs 5 and 6: sustained;

 d. paragraph 7: overruled;

 e. paragraph 8: sustained;

 f. paragraph 9: overruled;

5. Declaration of Sam Lee, dated September 2004:

a. paragraph 2 lines 1 through 4; overruled;

b. paragraph 3: overruled;

c. paragraph 4: overruled;

d. paragraph 5: overruled;

e. paragraph 6: overruled;

f. paragraph 7: overruled;

g. paragraph 8: overruled;

h. paragraph 9: overruled;

6. Declaration of Sam Lee, dated August 23, 2004:

a. paragraph 3: sustained;

b. paragraph 4: overruled;

c. paragraph 5: overruled;

d. paragraph 6: overruled;

e. paragraph 7: overruled;

f. paragraph 8: overruled as to the first sentence; sustained as to the second sentence;

g. paragraph 9: overruled;

h. paragraph 10: overruled;

i. paragraph 11: overruled;

j. paragraph 13: overruled;

k. paragraph 14: overruled; The court will not consider the content of the letter for the truth thereof;

l. paragraph 17: overruled;

m. paragraph 18: sustained as to the second sentence;

n. paragraph 22: overruled

### B. Eiger's Evidentiary Objections

Eiger objects to Rosen's reply memorandum, the declaration of Jack Rochel, the third declaration of W. Thomas Clements, the third declaration of Curtis C. Kucera, and moves to strike those documents. Eiger asserts that these documents inappropriately raised new grounds, arguments, and evidence on reply. Of the evidence submitted with Rosen's reply memorandum, the court only considered Exhibit A to the Third Declaration of W. Thomas Clements in Support of Application for Preliminary Injunction. This exhibit directly rebuts evidence presented in Eiger's opposition. Thus, even assuming Rosen's reply contained new grounds, arguments, and evidence, it did not prejudice Eiger.

### III.

### *ANALYSIS*

### A. Legal Standard

Section 283 of Title 35 of the United States Code authorizes injunctive relief in patent cases. The decision whether to issue a preliminary injunction pursuant to Section 283 turns on four factors: (1) the movant's reasonable likelihood of success on the merits, (2) whether irreparable injury to the movant will result if the injunction is not granted, (3) a consideration of the balance of hardships, and (4) the impact of the injunction on the public interest. *Hybritech Inc., v. Abbott Laboratories,* 849 F.2d 1446, 1451 (Fed.Cir. 1988). None of these factors is dispositive; "rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech,* 849 F.2d at 1451 (citation omitted). The moving party bears the burden of establishing that a preliminary injunction should issue. *Hoop v. Hoop,* 279 F.3d 1004, 1007 (Fed. Cir.2002).

### 1. Likelihood of Success on the Merits

To obtain a preliminary injunction, a movant must establish a likelihood of success on the merits with respect to validity and infringement of the patent. *Hybritech,* 849 F.2d at 1451; *Reebok,* 32 F.3d at 1557.

### a. Patent Validity

A patent is presumed valid. 35 U.S.C. § 282. As a result, the burden is

on a defendant to prove patent invalidity. *Quad Envtl. Tech. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed.Cir.1991). Once validity is questioned, the patentee must "present a clear case supporting the validity of the patent in the suit." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed.Cir.2001) (internal citations omitted).

### b. Patent Infringement

■ Claims of patent infringement are analyzed in a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device. *See Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir. 1999); *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309 (Fed.Cir.1998).

### c. Claim Construction

■ The construction of a patent claim is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). To determine the meaning of a patent claim, the Court considers three sources of intrinsic evidence: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), *aff'd, Markman*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577.

First, the court looks at the language of the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). "[T]he analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particu-

larly point out and distinctly claim the subject matter which the patentee regards as his invention." *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201–2 (Fed.Cir.2002) (internal quotations and citations omitted). The Federal Circuit imposes a "heavy presumption that the claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002); *Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 300 F.Supp.2d 923, 928 (C.D.Cal.2004). Dictionaries, encyclopedias, and treatises are "particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital*, 308 F.3d at 1202.

■ Second, it is always necessary to review the specification to determine if the presumption of ordinary meaning is rebutted. *Texas Digital*, 308 F.3d at 1204. The presumption is only rebutted in situations where "the inventor (1) acting as his own lexicographer, clearly sets forth an 'explicit definition' of the term that is different from its ordinary meaning; or (2) has disavowed or disclaimed scope of coverage by using words of 'manifest exclusion or restriction....'" *Stephen Key Design, LLC v. Lego Systems, Inc.*, 261 F.Supp.2d 1196, 1198 (N.D.Cal.2003) (citing *Texas Digital*, 308 F.3d at 1204). However, "if the meaning of the words themselves would not have been understood to persons of skill in the art to be limited only to the examples or embodiments described in the specification, reading the words in such a confined way would mandate the wrong result and would violate our proscription of not reading limitations from the specification into the claims." *Id.*

■ Third, the court may consider the prosecution history of the patent, if in evidence. *Vitronics*, 90 F.3d at 1582. "Al-

though the prosecution history can and should be used to understand the language used in the claims, it too cannot enlarge, diminish, or vary the limitations in the claims." *Markman*, 52 F.3d at 980 (internal quotations and citations omitted).

■ Extrinsic evidence should be used only if needed to assist in determining the meaning or scope of technical terms in the claims, and may not be used to vary or contradict the terms of the claims. *Stephen Key Design*, 261 F.Supp.2d at 1198; *Markman*, 52 F.3d at 981. However, the court is free to consult reference materials, such as dictionaries, for assistance in determining the ordinary meaning of a claim term and such sources are not considered extrinsic evidence. *Texas Digital Systems*, 308 F.3d at 1202–03.

■ Finally, "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman*, 52 F.3d at 985 (citation omitted). "Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Id.* at 986.

## 2. Irreparable Harm

■ Once the moving party establishes a likelihood of success with respect to patent validity and infringement, it is entitled to a presumption of irreparable harm if the preliminary injunction is not granted. *Fitness Prods. Int'l, L.L.C. v. Precise Exercise Equip., Inc.*, 2004 WL 1746252, 2004 U.S. Dist. LEXIS 16810 (C.D.Cal.2004), *citing, Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed.Cir.1996). To overcome this presumption, the nonmoving party must produce evidence sufficient to establish that the moving party would not be irreparably harmed. *Id.* Factors that courts generally consider are: 1) patents nearing expiration; 2) delay in bringing the suit; 3) infringer inability to pay damage award; 4) price erosion; 5) damage computation difficulty; and 6) effect on third parties. *See* 7 Donald S. Chisum, Chisum on Patents § 20.04[1][e].

## B. Discussion [2]

### 1. The '055 Patent

#### a. Claims 1 and 2

■ Rosen argues that Eiger's EVP–104DL and EVP–104DH ("accused product") infringes the '055 patent. Eiger counters that the accused product does not infringe the '055 patent because the product's "display unit" is thicker than 1.5 inches, a claim limitation in claims 1 and 2 of the '055 patent.[3]

Claims 1 and 2 of the '055 patent claim a ceiling-mounted display unit comprising a

2. Rosen alleges that the accused product infringes five of its patents. It is critical to note that one instance of infringement is sufficient to grant a preliminary injunction. *cf. Kearns v. GMC*, 94 F.3d 1553, 1555 (Fed.Cir.1996) (Each patent asserted raises an independent and distinct claim). However, because the preliminary injunction standard for patents requires the trial court to "weigh and measure each of the four factors against the other factors and against the magnitude of the relief requested," this court has considered each alleged instance of infringement. *Chrysler Motors Corp. v. Auto Body Panels of Ohio Inc.*, 908 F.2d 951, 953 (Fed.Cir.1990).

3. Because Eiger does not raise the question of the validity of the '055 patent, the court will presume its validity and only determine Rosen's likelihood of success with respect to infringement. *Amazon.com, Inc.*, 239 F.3d at 1359 (stating that plaintiffs burden with respect to validity only starts when validity is questioned).

generally planar mounting frame structure and screen "wherein the display unit has a thickness of less than 1.5 inches." '055 Patent, cols. 5–6. Both parties agree that the "display unit" includes the mounting structure and the screen. The determinative issue is how the court construes the meaning of "mounting structure." This interpretation will allow the court to determine whether the "display unit" limitations are present in the accused device. *See Johnson Worldwide Associates, Inc.*, 175 F.3d at 988.

The '055 patent describes this mounting structure as "a generally planar mounting frame structure" that joins with the ceiling of an automobile. Rosen stresses that "it is implicit from the specification that another component apart from the generally planar mounting frame is responsible for connection of the frame to the ceiling." The purpose of the mounting frame structure is to mount and house the screen and not function as a connection to the ceiling. Thus, Rosen argues that applying its construction of the '055 patent to the accused product, this court should only consider the planar portion of the accused product. Rosen calls this the "true mounting frame structure."

Eiger argues that when measuring the "display unit," the entire mounting structure of the accused device must be included. Its mounting structure includes "integral circuit board projections" that extend more than 1/2 inch from the flat surface of the frame structure. In addition, there are "integral DVD mount projections" that extend 3/4 inch from the flat surface of the frame structure and four "integral ceiling mount projections" that extend one inch from the flat structure. Finally, the struc-

ture has "sidewalls" that extend approximately one inch from the base of the mounting structure.[4] If any of these projections or the sidewalls are included in the measurement of the mounting structure, the display unit exceeds the 1.5 inch thickness claimed in the '055 patent.

Based on the claims and specification, this court concludes that for the purposes of the instant action, Rosen proposes the proper construction.[5] *See Markman,* 52 F.3d at 979. The '055 patent claims a generally "planar mounting frame structure." '055, col. 5:47. That claim language itself is unclear on its face because the court cannot determine what the structure is and what function it would have in relation to the entire display unit.

Because the claim language "is not clear on its face, then our consideration of the rest of the intrinsic evidence is directed to resolving, if possible, the lack of clarity." *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331 (Fed.Cir. 2001). In the '055 specification, figures one and two illustrate the display unit with openings for a connection device; however, it is important to note that the neither the claims nor the specification describe a device that would connect the display unit to the ceiling of an automobile. Moreover, the "frame structure" of the accused product does function in the same manner as the mounting frame structure of the '055 patent: to mount and frame the screen structure and the hinge mechanism. In light of the specification and consistent with the claim language, the court finds that the mounting frame structure means only the structure to which the screen and hinge attach. Thus, when comparing

---

**4.** Rosen refers to this as "decorative trim."

**5.** It is unnecessary to look to the prosecution history for this particular claim. Its construction is clear from the claim and specification.

Moreover, Eiger did not supply the court any information suggesting the 1.5 inch claim limitation resulted from the prosecution history.

the '055 product to the accused product for the purposes of infringement, the court will compare the accused device excluding all projections of the accused device to determine infringement.

The accused device infringes the '055 patent if all the claim limitations are present, either literally or by a substantial equivalent, in the accused device. *See Johnson Worldwide Associates, Inc.*, 175 F.3d at 988. Based on the court's adoption of Rosen's claim construction, there is a reasonable probability that Rosen can establish infringement. *See Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679 (Fed.Cir.1990) (noting that "a grant of preliminary injunction does not require proof of infringement beyond all question. The corollary proposition is that a denial of a preliminary injunction does not require that noninfringement be clear beyond all question"). The Kucera declaration, dated August 20, 2004, states that Kucera measured the thickness of the accused product's display unit as 1.0915 inches. Rosen includes evidence of this measurement in Exhibit I–13 of the Kucera declaration, dated August, 20, 2004. Eiger asserts that Rosen modified the units used in the Kucera measurement, but Eiger does not submit persuasive evidence to support this assertion. The court concludes there is a reasonable probability that the accused product has a thickness of less than 1.5 inches and thus infringes the '055 patent.

█ The court also concludes that Eiger's argument that the accused product's circuit board projections, DVD drive projections, ceiling mount projections, and sidewalls takes it outside the scope of '055 patent is unavailing. "It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *Tate Access Floors v. Maxcess Techs.*, 222 F.3d 958, 970 (Fed.Cir.2000)

(citations omitted). "For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write." *Id.* As with the example described given in *Tate Access Floors*, a display unit structurally infringing the '055 patent would not become noninfringing when incorporated into a display unit that also has additional elements for circuit board projections, DVD drive projections, ceiling mount projections, and sidewalls. Thus, the court concludes that Rosen has a reasonable probability of success of establishing that the accused product infringes claims 1 and 2 of the '055 patent.

**b. Claim 26**

Claim 26 of the '055 patent claims "[t]he display unit of claim 2, wherein the screen is rotatable about the second axis transverse to the first access." '055 Patent, col. 8:13–14. Rosen states that the accused product contains a second axis of rotation which is transverse to the first axis. Apparently, Eiger relies on the accused product not infringing claim 2 to support a noninfringement of claim 26 because Eiger does not address claim 26 in any of their opposing papers. Thus, based on the court's interpretation of claim 1 above, its comparison of claims 2 and 26 to the accused device, and Eiger's failure to present evidence refuting Rosen's contention, it concludes that Rosen also has a reasonable probability of success of establishing that the accused product infringes claim 26 of the '055 patent.

**2. The '255 Patent**

█ Claim 1 of the '255 patent describes:

[A] push-button mechanism coupled to the base and including a push-button actuator and a catch adapted to engage

the display unit to retain the display unit in the stowed position, wherein the actuator is slidable from a rest position in which the catch engages the display unit and retains the display unit in the stowed position, and a depressed position in which the actuator is moved toward the base and the catch is drawn out of engagement with the display unit, thereby enabling the display unit to pivot away from the stowed position

Rosen relies on this language to urge infringement by Eiger's accused device. Rosen argues that the accused product has a "push-button actuator," which slides "along a path between rest and depressed positions when pushed, and does employ an actuator." Moreover, the depressed portion "moves toward the base of the accused product." As a result, Rosen argues that the accused product "contains each and every feature of at least claims 1, 7, 10, and 12 of the '255 patent." [6]

In interpreting claim 1 of the '255 patent, Eiger argues that the "specification clearly and unambiguously describes and shows a particular type of push-button actuator which is slidable within a defined channel, moves in and out, and moves only in one direction when depressed..." Additionally, Eiger proffers that this definition is fully consistent with the common understanding of a push-button actuator. Thus, Eiger concludes that because the accused product does not have this type of push-button actuator, the accused product does not infringe the '255 patent.

Regarding the "push-button actuator" limitation, the court finds that Rosen's unsupported statement that the accused product has a push-button actuator is insufficient to satisfy Rosen's burden of showing a reasonable likelihood of infringement at the preliminary injunction stage, especially in the face of Eiger's equally unsupported statement to the contrary. The court recognizes that appropriate starting point is the language of the asserted claim itself. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir. 1995). In addition, the court recognizes that limitations from the specification are not to be read into the claims. *See e.g., E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir.1988). However, the meaning of the "push-button actuator" limitation is unclear to the court. "If the language of the claim is unclear on its face, then the court may consider the claim specification ... to resolve the claim's ambiguity." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001). Considering . '255's specification which illustrates something much different than the actuator on the accused product and Eiger's contention that the accused product's actuator is "rotatable about an axis" and not "push-button," the court cannot conclude that Rosen has a reasonable likelihood of success establishing the accused device infringes the '255 patent.

### 3. The '902; '086; and '449 Patents

 In light of the limited amount of evidence presented to the court, the court cannot appraise the likelihood of Rosen's success on the merits with respect to the factual determination of infringement of '902, '086, and '449 patents by the accused device.. The '086, '902, and '449 patents all claim limitations with a "video control module" located separately from the screen structure that is either mounted laterally or adjacently. Rosen argues that a circuit board located above the screen

---

**6.** Claims 7 and 10 are dependent on Claim 1. Claim 12 has the same push-button actuator that is determinative of Claim 1 and thus does not need to be independently addressed.

structure, in the mounting structure, is a "video control module." Eiger contends that this is not a video control module but it is a DVD drive module. Eiger states that its video control module is mounted within the screen structure. The parties have not provided this court with enough evidence to discern the difference between a DVD drive module and a video control module. Additionally, Eiger's physical evidence submitted to the court does not reveal whether there is a video control module mounted within the screen structure. Thus, based on the insufficiency of the evidence submitted by both parties, the court cannot appraise the likelihood of success on the merits with respect to these three patents. Therefore, with respect to the '086, '902, and '449 patents, the court holds that Rosen did not establish a likelihood of success on the merits.[7]

## 2. Irreparable Injury

■ "The second factor required to be established by a party seeking a preliminary injunction is that it will suffer irreparable harm if the preliminary injunction is not granted." *Hybritech, Inc.*, 849 F.2d at 1456. Because this court found a strong likelihood of success with respect to infringement of the '055 patent and because Eiger did not challenge the validity of the '055 patent, Rosen is entitled to a presumption of irreparable injury. *See e.g., Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239 (Fed.Cir.2003) (stating that if moving party clearly establishes the first factor by making a 'clear showing' of both validity and infringement, it is entitled to a rebuttable presumption of irreparable harm). Following the court's August 25, 2004 order denying Rosen's application for a TRO, the court again

finds that Eiger has submitted evidence that tends to rebut this presumption of irreparable harm because Rosen licenses its display units to other former infringers, including an offer to license to Eiger, and because Rosen delayed almost five months between notifying Eiger of the alleged infringements and initiating this action. *Polymer Techs. v. Bridwell*, 103 F.3d 970, 974 (Fed.Cir.1996) (stating "the presumption may be rebutted by evidence that ... (2) movants have engaged in a pattern of granting licenses under the patent ... or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability").

The court's inquiry does not end with Eiger's evidence of Rosen's licensing and delay. *See* Fed.R.Evid. 301 (In all civil actions burden ... remains ... upon the party on whom it was originally cast). In addition to the rebuttal evidence Rosen submitted in its application for a TRO, it now supports its irreparable harm claim with evidence that Eiger has failed to competently oppose. First, Rosen claims that Eiger is judgement proof. Second, Rosen claims Eiger is "price gouging," which results in market erosion of Rosen's display units.

To support their contention that Eiger is not financially sound, Rosen cites a telephone conversation between Rosen and Sam Lee ("Lee"), Eiger's Vice President, during which Lee stated that Eiger would "go out of business" if Eiger had to pay Rosen even a very low royalty rate. Moreover, Eiger's counsel implied to Rosen that Eiger would file for bankruptcy if forced to pay a royalty to Rosen. Finally, Eiger has submitted evidence confirming

---

7. Because the court did not find a likelihood of success by Rosen with respect to the alleged infringements by Eiger of the '255,- '902, '086, and '449 patents, the issues of

validity and obviousness are moot for the purpose of determining the instant application for a preliminary injunction.

that Eiger Vision is indeed a sole proprietorship.

Eiger's evidence opposing Rosen's assertion that Eiger is not financially sound is the declaration of Jesse Choi ("Choi"), General Manager of Eiger. Choi's declaration states that "Eiger is financially sound and has assets sufficient to satisfy any conceivable monetary damage award if it is eventually found liable for patent infringement." In addition to being wholly conclusory, Choi's statement is undermined by four statements in the same declaration that are left blank. Choi apparently omits any objective material that would refute Rosen's assertions. He provides no evidence of Eiger's assets, capital, revenues, sales, profits, or other ability to pay a judgement.

The court finds that Eiger's statements to Rosen that it would go out of business if forced to pay Rosen even a low royalty rate, coupled with the complete lack of evidence of Eiger's ability to pay a judgment, favors a finding of irreparable harm and granting a preliminary injunction. *See e.g.,* Chisum, Patents § 20.04[1][e][iv], *citing, Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120 (3rd Cir.1980), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980) (considering inability of accused infringer to pay potential damage award); *Wang Lab. v. Chip Merchant, Inc.,* 1993 U.S. Dist. LEXIS 20012, 16–17 (S.D.Cal.1993) (considering "that defendant is a small company run by a sole proprietor ... [i]t is unclear what the company nets, and ... such a small proprietorship may cease to exist or be judgment proof by the time of a trial on the merits, and thus unable to satisfy a money judgment on the royalties outstanding"); *cf. Reiffin v. Microsoft Corp.,* 158 F.Supp.2d 1016, 1028 (N.D.Cal. 2001) (stating that financial strength of the accused shows it would be able to respond to damages for infringement).

Rosen also claims that Eiger is engaged in predatory pricing and this situation is eroding its market, and putting Rosen's existence at risk. Rosen states that Eiger can price gouge because it does not develop, tool, or research its products. It is merely a "re-badger." A "re-badger" is a company that "merely purchases and imports infringing products from any source in the world that will sell infringing products at the lowest possible price and resells those products in the United States." Moreover, Rosen asserts that consumers are now associating the low quality of Eiger's products with Rosen because they are copies of Rosen's patented designs.

To support its price gouging claim, Rosen submitted an invoice from In Toons, LLC to Eiger, dated June 24, 2004. The invoice details the sale of one accused product from Eiger to In Toons, LLC for the price of $600.00. In opposition to Rosen's price gouging claim, Eiger's General Manager, Jesse Choi, declared that the suggested retail price of the accused product is $2457.00. As mentioned above, however, the omissions in Choi's declaration make it somewhat suspect and Eiger provides no further credible evidence rebutting Rosen's claims.

Having established a reasonable likelihood of success with respect to infringement of the '055 patent, Rosen is entitled to the presumption of irreparable harm. While Eiger provided some rebuttal evidence with respect to licensing and the timing of this action, it did not do so with respect to Eiger's ability to pay a judgment or with respect to price gouging and market erosion. *See e.g., Reebok,* 32 F.3d at 1556 (stating that the presumption of irreparable harm acts "as a procedural device which places the ultimate burden of production on the question of irreparable

harm onto the alleged infringer"). *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F.Supp.2d 362, 398 (S.D.N.Y. 2000), *aff'd*, 237 F.3d 1359 (Fed.Cir.2001) (applying the presumption to price erosion). Thus, the court concludes that there is a strong likelihood of irreparable harm to Rosen in the forms of inability to collect a judgment from Eiger, price gouging by Eiger, and the erosion of Rosen's market share.

### 3. Balance of the Hardships

The Court must balance the harm to the movant from the denial of the preliminary injunction with the harm that the non-movant will incur if the injunction is granted. *Hybritech*, 849 F.2d at 1457 (citation omitted). While it must be a considered factor, the balance of hardships need not tip in favor of the movant. *Id.*

Eiger states that it could lose a significant sum of money if enjoined from selling the accused product. Additionally Eiger contends an injunction would significantly harm its good will in the market, its market share, and current customer relations.

Rosen responds that if an injunction is not issued, its market will continue to erode during the course of the lawsuit. Rosen also contends that its ability to survive in the marketplace will be at risk. Finally, Rosen provides evidence that Eiger sells at least sixty products other than the two accused products at issue in this case and that the accused products are newly introduced.

The court, after engaging in the required balancing process, concludes that the balance of hardship tips in favor of Rosen. Rosen is a single-product company: flip-down display units. Eiger sells a wide range of electronic products and has at least 60 other products which it may continue to sell notwithstanding issuance of the requested injunction. Eiger has only sold the accused product for a "few months" and has been in existence for at least three years. Thus, while Eiger may be harmed if an injunction does issue, the harm is likely to be less significant than the harm to Rosen because Eiger can continue to sell its many other products that are not at issue in this action.

### 4. Public Interest

The fourth factor in determining whether to issue a preliminary injunction is the impact on the public interest. "The focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458 (citation omitted).

Eiger cites the public interest of a "competitor's continuing right to compete." Clearly, granting the injunction will deprive the public of the accused product. The injunction will also take the accused product out of the marketplace lessening competition for in the flip-down monitor market. However, Eiger's argument fails to overcome the strong public policy favoring the enforcement of patent rights. *PPG Indus. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed.Cir.1996). Therefore, the court finds that the preliminary injunction would benefit the public's strong interest in protecting patent rights.

### C. Bond Requirement

Rule 65(c) of the Federal Rules of Civil Procedure provide: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Eiger

has not presented any evidence regarding a reasonable bond amount to secure payment of the anticipated costs and damages it may incur if later it is determined that it was wrongfully enjoined. Absent such evidence, the court will order Rosen to give security in the sum of $100,000.00 for the payment of such costs and damages as may be incurred or suffered by Eiger if Eiger is found to have been wrongfully enjoined.

## D. Conclusion

Having weighed and measured each of the four factors "against the other factors and against the magnitude of the relief requested," *Chrysler Motors Corp. v. Auto Body Panels of Ohio Inc.*, 908 F.2d 951 (Fed.Cir.1990), the court concludes Rosen is entitled to a preliminary injunction enjoining Eiger from making, using, selling, distributing, importing, or offering for sale any product that infringes U.S. Patent No. 5,946,055 including but not limited to Eiger Vision brand model numbers EVP–104–DH and EVP–104–DL.

## IV.

### *DISPOSITION*

ACCORDINGLY, IT IS ORDERED THAT:

Rosen's application for a preliminary injunction is GRANTED;

### PRELIMINARY INJUNCTION

Based upon the Court filing an order granting Plaintiff Rosen Entertainment Systems, LP's ("Plaintiff") application for a preliminary injunction against Defendant Eiger Vision ("Defendant"), in which order are stated the reasons for issuance of such order and which reasons are incorporated in this order for Preliminary Injunction,

IT IS ORDERED that the Defendant Eiger Vision and its principals, agents, employees, successors and assigns and all those in active concert or privity with them are hereby enjoined from making, importing, using, selling, distributing, or offering for sale any product that infringes U.S. Patent No. 5,946,055, including but not limited to Eiger Vision brand model numbers EVP–104–DH and EVP–104–DL until this action has been finally determined.

AND, IT IS FURTHER ORDERED that this Preliminary Injunction be and is hereby conditioned upon Plaintiff's filing with the Clerk of this Court an undertaking in the form of a bond, certified check or cash in the amount of $100,000.00.