PURICLE, INC., a California corporation, Plaintiff and Counterclaim Defendant,

v.

CHURCH & DWIGHT CO., INC., a Delaware corporation, Defendant and Counterclaimant.

No. CV 08–3082 ABC (OPx).

United States District Court, C.D. California, Western Division.

July 25, 2008.

Clark S. Stone, Inchan Andrew Kwon, MacPherson Kwok Chen and Heid LLP, San Jose, CA, for Plaintiff and Counterclaim Defendant.

Anahit Tagvoryan, Jeffrey A. Rosenfeld, Dla Piper US, Los Angeles, CA, Cynthia A. Ricketts, Mark Nadeau, Shane D. Gosdis, Dla Piper US LLP, Phoenix, AZ, for Defendant and Counterclaimant.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

AUDREY B. COLLINS, District Judge.

Pending before the Court is Defendant and Counterclaimant Church & Dwight Co., Inc.'s ("C & D") Motion for a Preliminary Injunction ("Motion"), filed on June 30, 2008. Plaintiff and Counterclaim Defendant Puricle, Inc. ("Puricle") filed an Opposition on July 9, 2008, and C & D filed a Reply on July 15, 2008. The Court heard oral argument on July 21, 2008.

For the foregoing reasons, the Court **DE-NIES** the Motion.

## I.  PROCEDURAL BACKGROUND

Puricle filed its First Amended Complaint ("FAC") in this matter on June 27, 2008.  Therein, Puricle asserts several contract-based claims; claims for conversion, misappropriation, and unfair competition; and seeks declaratory relief to the effect that the non-competition clause in the Manufacturing Agreement between Puricle and C & D is unconscionable and unenforceable.  On June 30, 2008, C & D filed its Answer and Verified Counterclaims wherein C & D asserts claims for breach of contract and breach of the covenant of good faith and fair dealing, and seeks declaratory relief adjudicating the enforceability of the Manufacturing Agreement.  Along with its Answer and Counterclaims, C & D filed an Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.  The Court denied the TRO, and set a briefing schedule for the Motion for Preliminary Injunction

## II.  FACTUAL BACKGROUND

Puricle was founded in 2001.  Its business focuses on the development, manufacture, marketing, and sale of self-cleaning toilet systems, in particular, a line of products called the "NeverScrub" products. (FAC ¶¶ 9, 10.)

On September 26, 2005, Puricle and Orange Glo International, Inc. ("Orange Glo") entered into a written Manufacturing Agreement (the "MA," attached as Exhibit A to the FAC) by which Puricle agreed to manufacture, and Orange Glo agreed to purchase, Puricle's NeverScrub system and its associated refills.[1]  These items were to be manufactured by Puricle and

sold by Orange Glo as the "Kaboom NeverScrub System" and "Kaboom Never-Scrub System Refill" (collectively, the "Kaboom NeverScrub Products").  (FAC ¶ 12.)

Under the MA, Puricle agreed to stop its own direct sales of the NeverScrub products to retailers (by December 31, 2006), and Orange Glo became the exclusive distributor of the "NeverScrub" products to retailers under the "Kaboom" brand.  (FAC ¶ 13.)  The MA acknowledges that the trademark "NeverScrub" belongs to Puricle, and the trademark "Kaboom" belongs to Orange Glo. (FAC Ex. A, Schedule 2.)

The term of the agreement was for three years, with automatic renewal terms of one year, unless a party wishing to terminate the agreement provided written notice of termination 180 days prior to the automatic renewal date.  (FAC Ex. A, §§ 6.1, 6.2.)

By these provisions, the three year initial term of the MA was set to expire on September 26, 2008.  By a March 14, 2008 letter, Elisa Sim of Puricle reminded C & D that the final day to provide written notice of termination of the contract was March 26, 2008; otherwise, the MA would automatically renew for one year.  (Worrell Decl. Ex. 1.) On March 21, 2008, C & D instructed Puricle by email to cease all production of the Kaboom NeverScrub Products.  (FAC ¶ 30.) On March 24, 2008, C & D notified Puricle by letter that C & D was terminating the MA effective September 25, 2008.  (FAC ¶ 31.)

In a March 31, 2008 letter, Puricle proposed an early termination of the MA and that C & D work with Puricle to transfer retailers currently purchasing Puricle's products from C & D to Puricle so that

---

1.  On August 7, 2006, defendant C & D acquired the business of Orange Glo relating to the Kaboom NeverScrub Products.  (FAC ¶ 15.)  Both Puricle and C & D agree that Orange Glo's rights and obligations under the MA were thereby assigned to C & D.

Puricle could provide Puricle-branded products to those retailers. (FAC ¶ 33.) On April 4, 2008, C & D stated that "at present we have no intention of issuing further purchase orders for the supply of [Kaboom Products] during the period running through the September 25 termination effective date." (FAC ¶ 34.)

Shortly thereafter, on May 9, 2008, Puricle filed its Complaint initiating this action. In its FAC, filed on June 27, Puricle alleges that C & D acted in a manner that reduced the sale of the Kaboom NeverScrub Products to retailers, including, for example, by failing to promote and market the products, and that this conduct violated the MA. (FAC ¶¶ 17–23.) Puricle further alleges that C & D breached the MA by failing to provide a forecast of C & D's estimated orders of the Kaboom NeverScrub Products or a production plan. (FAC ¶¶ 24–29.) Puricle also alleges that C & D has used Puricle's confidential information to produce a competing product, called Kaboom Scrub Free, that is substantially similar to Puricle's NeverScrub product. (FAC 42–43; Sim Decl. ¶¶ 58–59.)

Thereafter, C & D filed its Answer and Counterclaims, pursuant to which it now seeks a preliminary injunction. C & D contends that Puricle is now selling its own version of the Kaboom NeverScrub Products, labeling them as "NeverScrub," and that this conduct breaches several provisions of the MA, which C & D argues remains in place until September 25. Specifically, C & D argues that by selling NeverScrub, Puricle is violating section 5.2 of the MA, in which Puricle granted to C & D the exclusive rights to distribute and sell the Kaboom NeverScrub Products:

> [Puricle] ... shall [not] manufacture, sell, or otherwise handle or deal (indi-

rectly or directly) in any goods which are copies, replicas or imitations of the Products, or [ ] are based upon the Specifications [ ] of the products. (FAC Ex. A, § 5.2.)

C & D also contends that Puricle is violating section 5.4 of the MA, in which Puricle granted to C & D an exclusive license to market, distribute and sell the Kaboom NeverScrub Products, as follows:

> [Puricle] hereby grants to [C & D] an exclusive, irrevocable worldwide license [to] market, distribute and sell the Products [ ] worldwide in all channels of trade. [ ] For avoidance of doubt, during the Term, [Puricle] shall not grant any license to any third party to market, distribute or sell the Product or to otherwise use the Technical Information, nor shall [Puricle] engage in any such activities on its own behalf except as specified within this agreement.[2] (FAC Ex. A, § 5.4.)

Finally, C & D argues that Puricle is violating section 5.7 of the agreement, a non-competition and non-solicitation agreement barring Puricle from engaging in competition with C & D, as follows:

> [D]uring the Term of the Agreement and for a period ending six (six) months following the termination of expiration hereof (the "Non–Competition Period") [Puricle shall not] manufacture, market, sell or distribute *any products* which are directly or indirectly competitive with the Products [and shall not] solicit or induce ... any customer, client, vendor, lender, supplier or sales representative of [C & D] to discontinue its relationship or reduce the amount of business done with [C & D]. (FAC Ex. A, § 5.7) (emphasis added.)

---

2. The only exception allowing Puricle to conduct direct sales is set forth in section 5.7. By its own terms, that exception expired on December 31, 2006, and is therefore not applicable.

Based on these allegations, C & D seeks a preliminary injunction barring Puricle from dealing in any toilet bowl cleaning products, soliciting any C & D customers, or holding itself out as a licensee, manufacturer, etc., of C & D or any toilet bowl cleaning products. C & D further asks the Court to order Puricle to turn over any of C & D's confidential information to C & D, to direct all retailers, customers, etc., to remove Puricle's NeverScrub product from store shelves; to remove all references to NeverScrub from the Puricle website; and to provide the Court and C & D with a sworn statement detailing its efforts to comply with these orders.

Puricle opposes the Motion on a number of grounds, arguing that the MA is unenforceable and that C & D has not shown each and every element required to obtain preliminary injunction.

## III. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

■ To obtain a preliminary injunction, the moving party must show "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir.1999). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Id.* (internal quotations omitted). "Thus, the greater the relative hardship to [the moving party], the less probability of success must be shown." *Id.; see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993). "The district court must also consider whether the public interest favors issuance of the injunction." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917 (9th Cir.2003). A preliminary injunction is an "extraordinary remedy" for which the need must be "clear and unequivocal."

*Shelton v. National Collegiate Athletic Ass'n*, 539 F.2d 1197, 1199 (9th Cir.1976).

■ The Court may consider inadmissible evidence on a motion for preliminary injunction. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm."); *Rosen Ent. Sys., LP v. Eiger Vision*, 343 F.Supp.2d 908, 912 (C.D.Cal.2004). "The exigencies of preliminary relief often prevent the movant from procuring supporting evidence in a form that would meet Rule 56(e)'s requirement of evidence admissible at trial." *Dr. Seuss Ents. v. Penguin Books USA, Inc.*, 924 F.Supp. 1559, 1562 (S.D.Cal.1996). "Such evidence may yet be considered by the court, which has discretion to weigh the evidence as required to reflect its reliability." *Id.*

## IV. ANALYSIS

C & D argues that Puricle is breaching three provisions of the MA, and that Puricle is breaching the covenant of good faith and fair dealing. However, as Puricle argues and C & D concedes, C & D's claim for breach of the implied covenant is subsumed within its other claims. *See* Opp'n 17:18–18:15; Reply 17:4–10. As such, the Court will not address this claim separately.

### A. C & D's Claims that Puricle is Breaching Sections 5.2, 5.4, and 5.7

#### 1. C & D Has Raised Serious Questions Going to the Merits of its Claim that Puricle is Breaching Sections 5.2 and 5.4.

Under section 5.2 of the MA, Puricle promised that it would not manufacture or

sell goods which are copies, replicas or imitations of the Products, or otherwise based upon the specifications of the products. Under section 5.4, Puricle granted to C & D the exclusive right to market, distribute and sell the Kaboom Never-Scrub Products for the duration of the agreement, and expressly committed that Puricle would not itself market, distribute, or sell the Products. Both terms expire with the MA, that is, on September 26, 2008.

C & D has presented evidence that Puricle has violated, and continues to violate, these terms. For example, C & D has presented evidence that Puricle was selling its NeverScrub products at Wal–Mart retail locations and on its website in May and June 2007. (Allen Decl. ¶¶ 11–12.) Puricle's president Elisa Sim does not deny this allegation, but instead admits selling the products and argues that these breaches were inadvertent because Puricle overlooked the relevant contract term. (Sim Decl. ¶¶ 10, 30–33, 52.) Ms. Sim also states that Puricle has not sold its Never-Scrub product directly to any entity other than Orange Glo or C & D since December 31, 2006. (Sim Decl. ¶ 52.) However, the claim that the May and June 2007 breaches were inadvertent is belied by a February 2006 email exchange between Ms. Sim and Orange Glo employees demonstrating that Ms. Sim was cognizant of the applicable contract terms and understood it. (Allen Reply Decl. ¶¶ 21–23; Ex. A.)

Although C & D has presented evidence that at least two Wal–Marts continue to sell Puricle's NeverScrub (*see, e.g.*, Tucker Decl. ¶¶ 4–5; Allen Reply Decl. ¶¶ 54–59; Exs. C, D, and E), Puricle denies having engaged in recent sales to Wal–Mart, and contends that the NeverScrub items found in those stores must have been old stock. (Sim Suppl. Dec. ¶ 2.) This conflicting evidence creates a substantial factual dispute over whether Puricle continues to sell Nev-

erScrub to Wal–Mart. However, there is undisputed evidence that Puricle is currently selling, or trying to sell, the product to other retailers. C & D has presented evidence that in June 2008, Sim contacted the home improvement retailer Lowe's stating that Puricle would like to sell the NeverScrub product to Lowe's directly instead of through a third party vendor. (Kreszl.Decl.¶¶ 4–6, Ex. C.) Similarly, C & D has presented evidence that around June 26, 2008, Puricle offered to sell to Menard's a product that looks so much like Kaboom that a supervisor at Menard's told his buyer to buy the Puricle product. (Allen Reply Decl. ¶¶ 66–68, Ex. F.) Finally, Sim admits that, since C & D gave notice in March, 2008 that it would terminate the MA on September 25, Puricle has been selling "the NeverScrub product in the same packaging that Puricle used during its permitted direct sales in 2006" on its website. (Sim Decl. ¶ 65.) This evidence shows that Puricle continues to sell its NeverScrub product on-line, and that Puricle is attempting to sell such products to other retailers, such as Lowe's and Menard's. Such conduct likely violates sections 5.2 and 5.4 of the MA.

In its tentative Order, the Court indicated its view that, based on such evidence, C & D has shown a strong likelihood of success on the merits of its claims based on sections 5.2 and 5.4. The Court also explained its determination that the non-competition provision in section 5.7 was void and unenforceable as a restraint of trade in violation of California Business & Professions Code Section 16600, and invited the parties to expand upon their positions on the non-solicitation provision of section 5.7. However, for reasons that will be made clear in the following section, the Court finds it unnecessary to elaborate on the merits of C & D's claim based on section 5.7.

### 2. Puricle Has Raised Serious Questions Going to the Enforceability of the MA.

The Court noted in its tentative order that two of Puricle's arguments challenged the enforceability of the entirety of the MA. These arguments are (1) that Puricle is excused from further performance under the MA because C & D has itself failed to perform by not placing additional orders for the products since March 2008, and (2) that C & D has used Puricle's confidential technical information in violation of MA section 5.5 in its development of a very similar product called "Kaboom Scrub Free" with packaging that is nearly indistinguishable from the co-branded "Kaboom NeverScrub" product. Puricle thus argues that C & D itself anticipatorily breached the MA and should not be able to enforce it against Puricle, and therefore concludes that C & D has little likelihood of success on the merits of any of its claims.

With respect to C & D's failure to place any orders since March 2008, Puricle has not specified which terms of the MA this conduct violates, such as a term binding C & D to order a minimum quantity of product per month or establishing Puricle as C & D's exclusive manufacturer. Although Puricle refers vaguely to "related agreements" and a course of conduct as establishing terms that C & D has violated, the only such "agreement" Puricle has presented in connection with the Motion is the "Process for Turnkey Suppliers" (Sim Decl. Ex. D) whose terms C & D's alleged conduct does not appear to violate. Accordingly, Puricle's argument that it is excused from performance under the MA by C & D's failure to place more orders is unavailing.

■ Puricle has, however, raised sufficient questions about C & D's conduct with respect to Puricle's confidential information to cast some doubt on C & D's likelihood of success on the merits of its contract claims. In its tentative Order, the Court noted Puricle's allegation in its FAC that when C & D came up with its own version of the product, the "Scrub Free," it used Puricle's confidential and trade secret information in violation of a Confidentiality Agreement the parties entered into on January 25, 2007 barring the parties from disclosing or using the other party's confidential information. (FAC ¶¶ 37–45, Ex. B.) The MA also contains a provision barring C & D from infringing on any of Puricle's technical information, which is defined to include "patents, . . . trademarks and service marks, . . . copyrights, . . . inventions, processes, designs, knowhow, information and formulae embodied in the Products". (FAC Ex. A "Technical Information" definition, and section 5.5.) At oral argument, Puricle maintained its position that C & D used Puricle's confidential technical information in creating the Scrub Free and that Scrub Free is a "knock-off" of the NeverScrub. Although counsel did not direct the Court's attention to it, the Court re-examined Ms. Sim's Declaration wherein Ms. Sim explains the ways in which the C & D product resembles the NeverScrub product. Physical specimens of the products were also submitted, including the NeverScrub product that Puricle manufactured before entering into the MA (Sim Decl. Ex. B), the Kaboom NeverScrub that Puricle manufactured pursuant to the MA (Sim Decl. Ex. U), and the Kaboom Scrub Free that C & D is now selling (Sim Decl. Ex. S) instead of Puricle's product.

First, the Court notes that the product Puricle was manufacturing before the MA and the product it manufactured under the MA are virtually indistinguishable. Second, as Ms. Sim observes, the Scrub Free product is similar to the NeverScrub product in several respects. Both products have inlet and outlet tubes that are at-

tached in a conventional flush toilet between the toilet tank water inlet valve and the overflow tube; both products have a screw-on cap that the consumer removes to refill the device with the cleaning chemical; both devices use a clip to attach to the toilet tank, and the ScrubFree clip is almost identical to the NeverScrub clip; and both products include a clip for attaching the outlet tube to the toilet overflow tube. (Sim Decl. ¶¶ 60–61; Exs. B, U, S, and T.) In addition, as is evident from exhibit T, a photograph of the NeverScrub and Scrub Free products side-by-side on a retailer's shelf, the Scrub Free product is marketed in packaging that is very similar to the NeverScrub packaging: the packages are the same size, use the same colors and color scheme, use very similar fonts, and use nearly identical language in advertising the features of the products. (Sim Decl. Ex. T.) [3] The similarity of the packaging is also apparent from looking at the physical exhibits Puricle lodged. The packaging is so similar that it takes some care to realize that these are two different products.

In response, one of C & D's in-house attorneys stated during oral argument that although he is not an intellectual property attorney, he knows that no Puricle technical information was used in the creation of the Scrub Free. Legal conclusions asserted by counsel are not evidence. As such, the Court can give that testimony little weight.

Puricle might have offered additional evidence tending to show that the Scrub Free product used Puricle's technical information. However, Puricle asserted at oral argument that it only learned that C & D was selling Scrub Free on around June 23, 2008, when Ms. Sim found the product on a retailer's shelf. That Puricle only recently discovered Scrub Free is supported by the fact that Puricle filed its FAC shortly thereafter, on June 27, adding appropriate allegations and claims based upon that discovery of C & D's Scrub Free. Thus, given that Puricle discovered the Scrub Free only relatively recently, that Puricle did not present more evidence of C & D's use of its confidential technical information is understandable.

In any case, the evidence supplied in the Sim Declaration is sufficient to impact the Court's assessment of C & D's likelihood of success on the merits. Specifically, based on the above evidence of the similarity of the products, there is some support for Puricle's allegation that C & D has misappropriated Puricle's trade secrets and has used its technical information in violation of section 5.5 of the MA, thereby anticipatorily breaching the MA and excusing Puricle from further performance of the entirety of the contract.

In short, although the evidence currently before the Court suggests that C & D has a greater likelihood of success on the merits of its claims than Puricle does, both parties have raised serious issues going to the merits of their claims. Accordingly, because the evidence makes C & D's likelihood of success less certain, the Court concludes that C & D has raised a serious question going to the merits of its claims, and this case falls closer to the "alternative test" on the preliminary injunction continuum. As such, the Court must assess the balance of hardships differently and afford it greater weight.

---

**3.** At oral argument, Puricle's counsel presented, from each product, a sheet of twelve small stickers used to indicate when the consumer should replace the cleaning chemical. These stickers are very similar in appearance, but it is not evident that they constitute "technical information," nor is it clear to which party the design features of these stickers belong. As such, the Court affords the stickers no weight in its assessment of Puricle's claims.

**B.  *Balance of Hardships & Probability of Irreparable Injury***

Because C & D has raised a serious issue going to the merits of its claims (but has not shown a *strong* likelihood of success on the merits), C & D must demonstrate that "the balance of hardships tips sharply in its favor." *Walczak,* 198 F.3d at 731. "The balance of hardships factor may assume significance in cases where the plaintiff has not established a strong likelihood of success on the merits ..." *Cadence Design Sys., Inc. v. Avant! Corp.,* 125 F.3d 824, 830 (9th Cir.1997).

The Court finds that the balance of hardships tips sharply in Puricle's favor, not C & D's. Ms. Sim's declaration sets forth facts showing that a preliminary injunction would cause great hardship to Puricle. Specifically, Ms. Sim asserts that 94% of Puricle's revenue in 2007 comprised sales of NeverScrub to C & D, and that through March 2008, Puricle's sales to C & D comprised 100% of its revenue. (Sim Decl. ¶¶ 63–64.) The NeverScrub product is Puricle's only product and source of revenue; Puricle does not sell any other product. (*Id.* ¶ 66.) Since C & D stopped placing orders in March 2008, Puricle's sales have amounted to only $3,623. (*Id.*) Ms. Sim asserts that "[t]o survive as a business, Puricle needs to be able to sell the NeverScrub product to retailers and on-line during this litigation." (*Id.*) In light of the above facts, Ms. Sim states that should the Court grant the requested injunction, "it is extremely likely that Puricle will be forced out of business." (*Id.* ¶ 67.)

By contrast, the hardship that C & D would suffer if an injunction is not issued, while not trivial, is not so extreme it outweighs the hardship that Puricle would bear if the injunction is issued. C & D's hardship is detailed in the evidence it presented showing that Puricle is breaching the MA. For example, in her June 23 email to Lowe's, Ms. Sim stated "We currently have our Kaboom NeverScrub product at all Lowe's stores. However, this item will be discontinued and we would like to have the NeverScrub reintroduced into the plumbing department." (Kreszl Decl. Ex. C, p. 61.) From the remainder of the email trail, it is clear that this solicitation communication—which the MA would prohibit Puricle from making, assuming it is enforceable—caused confusion at Lowe's as to whose product the Kaboom NeverScrub was, whether it was in fact being discontinued, and if so, by whom. (*Id.*) C & D's evidence that Puricle has attempted to sell its products to Menard's also shows that C & D is at risk of losing customers due to Puricle's conduct. *See* Allen Reply Decl. Ex. E (an internal C & D email reporting that Menard's buyer was instructed by his boss to purchase Puricle's product because it was offered at a low price and looks so much like Kaboom.) In this Circuit, intangible injuries, such as damage to goodwill and reputation, and the loss of customers, can constitute irreparable harm. *See Rent–A–Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991); *see also, Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir.2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *eBay, Inc. v. Bidder's Edge, Inc.,* 100 F.Supp.2d 1058, 1066 (N.D.Cal.2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.")

However legally cognizable such irreparable harm may be, C & D has not shown that being denied an injunction would have any consequences to its business or prospects other than the direct harm that it

attributes to Puricle's alleged breaches. Indeed, C & D asserts that it is "one of the leading producers of packaged consumer goods in the United States" and that it sells numerous products under many different well-known brand names. (C & D's Mot. at 1.) C & D's revenue in 2007 was approximately $2.2 billion. (Stone Decl. ¶ 32.) Although C & D's size and success do not render it ineligible to obtain a preliminary injunction against a small adversary, those characteristics do mean that C & D is better able than Puricle is to absorb the above-described consequences of an unfavorable ruling. Such harm does not impose an extraordinary hardship on C & D, and is certainly not as grievous as the possibility of going out of business. Because C & D's claims cannot be characterized as having a "strong likelihood of success on the merits," its ultimate success is uncertain. Accordingly, the hardships Puricle would bear should an injunction issue may well turn out to be unjustified. That these potentially-unjustifiable hardships would be extreme compels the Court to deny the injunction.

### C. *Public Interest*

The Court finds that the public interest does not weigh significantly either for or against the issuance of a preliminary injunction.

### V. CONCLUSION

Both parties have raised serious questions going to the merits of their claims. Even assuming that Church & Dwight's position is somewhat stronger at this stage than Puricle's position is, it would be improvident to grant the injunction in light of the extreme hardship an injunction would impose upon Puricle. The Court is not, of course, expressing any final opinion on whether the Manufacturing Agreement is enforceable. Instead, the questions Puricle has raised about the enforceability of the Manufacturing Agreement and the

hardships that an injunction would cause to Puricle preclude the Court from determining that the need for a preliminary injunction is "clear and unequivocal".

Church & Dwight's Motion for a Preliminary Injunction is therefore **DENIED**.

**IT IS SO ORDERED.**